(No. 36977.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* RICHARD HUFF, Plaintiff in Error.

*Opinion filed November 26, 1963.*

HOWARD KORENGOLD, of Chicago, appointed by the court, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH and E. MICHAEL O'BRIEN, Assistant Attorneys General, and ELMER C. KISSANE and MATTHEW J. MORAN, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

The defendant, Richard Huff, was jointly indicted with Earline Poke in the criminal court of Cook County for the murder of Bernice Poke, the two-year-old daughter of Earline Poke. He pleaded not guilty, and the cause was severed for trial upon his motion. He waived trial by jury, was tried by the court, found guilty of involuntary manslaughter and sentenced to an indeterminate term of three to eight years in the Illinois State Penitentiary.

On this writ of error he contends that his guilt was not proved beyond a reasonable doubt, and that the failure of the prosecution or the court to call Earline Poke as a witness deprived him of a fair trial.

During the six-weeks period immediately preceding September 16, 1960, the defendant, who was unmarried and 25 years of age, lived in a Chicago apartment with Earline Poke, a married woman then living apart from her husband.

Also living in the apartment were Earline Poke's two minor children, one of whom was two-year-old Bernice Poke. Late in the afternoon of September 16, Bernice Poke was pronounced dead. When an examination of the child's body revealed signs of physical abuse, the defendant and Earline Poke were arrested and charged with murder.

Two witnesses who lived in the same apartment building as the defendant testified that over a period of at least four weeks they heard sounds coming from the direction of the apartment where the defendant and Earline Poke lived—a man saying "Jesus wept; say Jesus wept" and "eat your food" followed by four or five sounds of "beating like on flesh with a belt" and the sound of a baby crying. These sounds, which were heard by one witness about twice a week and by the other witness apparently more frequently, lasted from five to ten minutes on each occasion. One of the witnesses heard these sounds on September 15 at about 8 A.M., and the other heard them at 10 or 11 P.M. Both witnesses heard them between 7 and 8 P.M. on that date. One of them testified that at about 4 A.M. on September 16 she heard a man say "get up under that cover; I said get up under that cover" followed by two beating sounds but no sounds of a baby crying. This witness also added that on one occasion she heard a woman say "you hit me", and that this was the only time she heard a woman's voice coming from the direction of the defendant's apartment. Neither witness had ever seen the defendant strike the child and neither had seen any of the occupants of the defendant's apartment until after the child's death.

An elastic belt and a leather strap were introduced in evidence. The belt, with a metal buckle attached, was removed from defendant's person at the police station following his arrest on the night of September 16. The strap, which had a knot tied on one end, was obtained by a police officer from the floor of a closet in the defendant's apartment. A police officer testified that when he showed the elastic belt and the

leather strap to defendant shortly after his arrest, the defendant stated that he had struck Bernice Poke with both the belt and the strap, but had never hit her with the leather strap in a knotted condition.

At the trial the defendant testified that he had never hit the child with the leather strap, even in an unknotted condition, but that he and Earline Poke had each hit her with the elastic belt on several occasions. He stated that the last time he struck the child was at about 2 A.M. on September 16, at which time, while he was in bed, he hit her three or four times on the leg and hand with the belt as she was walking toward the washroom, since she had wet the bed; that at that time he did not notice any lacerations or lesions on the child's body and that he was unable to explain the cause of the injuries which were found on the child's body after her death; that during the morning and afternoon of September 16 he was out of the apartment for about 2½ hours, and slept from 1:30 to 5 P.M., at which time he awoke and noticed for the first time that the child was ill; that prior to 2 A.M. on September 16 he had whipped Bernice Poke with the belt only three times—once while he was teaching her to say "Jesus wept" before eating, and twice for wetting herself, and that on none of these occasions, which were about one week prior to September 16, did he ever hit her with the buckle. He testified that he never struck the child in the head with the belt and never hit her with his hand or fist. He further testified that about one week prior to September 16 he attempted to strike the child with the belt but instead hit Earline Poke by mistake.

Dr. Augustus Webb, a physician, testified that on September 16 he performed a postmortem examination. "The external examination showed numerous contusions and lacerations of various sizes on the head, on the trunk and on the extremities, most marked on the back and on the buttocks." These injuries were about an inch wide and followed a straight line pattern, sometimes interrupted by

"deeper lesions in the tissue that were redder and somewhat circular, roughly." The lacerations varied in depth and "when the tissues were cut into they were found to extend through the abdominal wall to the inner layer, that is, there were hemorrhages from the skin all the way into the inside of the abdomen." He testified that the belt and buckle could have caused these injuries.

An external examination of the scalp showed only "slight discoloration" on each side of the head "from the top on down to a little above the ear." This discoloration was not localized but "practically covered the whole area". The doctor stated that the child's thick head of hair, which was not shaved off during the post-mortem examination, would make less conspicuous external marks on the scalp caused by trauma. Upon removing the scalp "hemorrhage was seen extending all through the scalp." Dr. Webb further testified that in his opinion the cause of death was traumatic intracranial hemorrhage caused by external violence to the head; that an internal examination of the skull revealed "diffuse hemorrhages, both fluid and partly coagulated, on both sides of the inner cavity;" that the hemorrhaging could have been caused by striking the child on either side of the head with either the belt or the strap, but that a fall also could have caused the injury. On cross-examination he testified that it was impossible to fix the exact time or day when the fatal injury to the head was incurred.

We agree with the defendant that it was incumbent upon the State to prove beyond a reasonable doubt that defendant caused or contributed to the injury to the head which caused the child's death. We agree, too, that Dr. Webb's testimony does not indicate that the injuries to her abdomen, back and legs and arms either caused or materially contributed to her death. But those injuries are significant in that they show the number of blows that were struck, their random direction and the great force with which they were delivered.

The defendant himself testified that on one occasion he struck at the child but hit Earline Poke by mistake. He also testified that on the day of the child's death he swung at the child while he was lying in bed and she was walking toward the washroom. The inferences that flow from these admissions of wild, haphazard blows are not dissipated by the defendant's testimony that he had never struck the child on the head. There is no evidence that the injuries to the child's head were caused by a fall, or by any agency other than the defendant's blows. On the other hand there is evidence of repeated and irresponsible mistreatment, culminating in at least four separate beatings during the two days preceding the child's death.

A conviction may be based upon circumstantial evidence, and this court has held that the manner of death and the means by which it was inflicted may be inferred from the circumstances proved. (*People* v. *Bartell*, 386 Ill. 483.) The fact that the circumstantial evidence relied upon must not give rise to any reasonable hypotheses under which the defendant could be innocent of the crime charged, (*People* v. *Benson*, 19 Ill.2d 50; *People* v. *Hooper*, 364 Ill. 320; *People* v. *Ahrling*, 279 Ill. 70), does not mean that the trier of fact is "required to search out a series of potential explanations compatible with innocence, and elevate them to the status of a reasonable doubt." (*People* v. *Russell*, 17 Ill.2d 328, 331.) From a review of the entire record, we are of the opinion that the trial court did not err in holding that there was sufficient evidence to establish the defendant's guilt beyond a reasonable doubt.

The defendant's contention that he was deprived of a fair trial because neither the prosecution nor the court called Earline Poke as a witness cannot be sustained. The prosecution is not obliged to call all available witnesses. (*People* v. *Wright*, 27 Ill.2d 557; *Carle* v. *People*, 200 Ill. 494.) The defendant did not call Earline Poke as a witness although she was apparently available to testify, nor did he ask that

she be called as the court's witness. Under these circumstances we conclude that the defendant was not denied a fair trial.

The judgment of the criminal court of Cook County is affirmed.

*Judgment affirmed.*