THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GEORGE THOMAS KEITH, Defendant-Appellant.

Fifth District   No. 77-208

Opinion filed November 9, 1978.

KARNS, J., dissenting.

Robert L. Douglas, of Robinson, for appellant.

William J. Scott, Attorney General, of Springfield, and Raymond McCamy, State's Attorney, of Robinson (Donald B. Mackay and Charles H. Levad, Assistant Attorneys General, of counsel), for the People.

Mr. JUSTICE JONES delivered the opinion of the court:

Defendant, George Thomas Keith, was charged by indictment in Crawford County with several offenses including the murder of his wife, Nira Jean Keith. Pursuant to a change of venue, defendant was found guilty of involuntary manslaughter following a jury trial in the circuit court of Jefferson County and sentenced to a term of from three to nine years in the penitentiary.

On appeal, defendant raises numerous issues for our consideration; however, we need only address defendant's contention that he was denied due process as a result of the State's improper disclosure of the results of an expert's examination which were favorable to his defense.

It was established at trial that Nira Jean Keith died as a result of injuries she received from the discharge of one barrel of a .12-gauge shotgun. The shooting occurred around 1:15 a.m. October 31, 1976, in the home of the defendant and Jeanie Keith upon her return from a Halloween party at the Moose lodge in Robinson, Illinois. Although the defendant and his wife were in several of the same taverns in the evening hours preceding the incident, it appears that defendant might not have been aware of this fact. Mrs. Keith was driven home from the Moose by her cousin Robert Coulter, in the company of his wife, Judy. All three entered the Keith residence and were quickly confronted by the defendant who was armed with a double-barrelled shotgun. It is

undisputed that Jeanie Keith lunged or ran at the defendant in an attempt to grab the gun; however, there was sharp conflict as to whether she touched the gun before it discharged and she was wounded.

This case was submitted to the jury with instructions as to the offenses of murder, voluntary manslaughter and involuntary manslaughter. Aside from testimony offered to show defendant's aggressive behavior towards his wife in the past and statements he had made reflecting an unfavorable attitude towards her existence, the evidence centered around the accounts of the incident given by Robert and Judy Coulter and the defendant. Defendant's defense was accident or misadventure.

The record reflects that defendant was standing in an archway and was holding the gun when it discharged.

Judy and Robert Coulter both testified on direct examination that Jeanie Keith reached for the gun, that she did not touch it and that defendant then stepped back, brought the gun down and shot her.

Judy Coulter, however, admitted on cross-examination that all she could see from her position in the living room was the end of the gun barrel. She could not see the defendant's right hand and consequently could not see if he had his finger on the triggers. She further admitted that she did not actually see the defendant pull the trigger.

Defense counsel attempted to impeach Robert Coulter's testimony on the basis of his recent imbibing of alcoholic beverages. Mr. Coulter testified on cross-examination that he drank four or five beers between 1 and 2 p.m. and that he drank 10 to 12 beers that evening while at the Moose lodge prior to this incident. He agreed that it would be fair to characterize him as being fairly confused as to the events that occurred during October 30 and the early morning hours of October 31, 1976; however, he stated that there was no confusion in his mind as to the points that Mrs. Keith did not touch the gun and that he saw defendant fire the gun from his hip.

The defendant testified that he returned home from the Moose lodge around 10:30 p.m. and that about midnight he fell asleep on the bed while fully clothed. He woke up to a loud man's voice in his living room. He got his shotgun and went down the hall, stopping in the opening to the living room from which he saw his wife and Robert and Judy Coulter. He pointed the gun at Robert Coulter and ordered him out of the house. Jeanie then ran at the defendant saying, "No Tom, don't." He pointed the gun at the ceiling and took a step back from his wife. He was holding the gun with his right hand on the stock and his left hand on the gun's "forearm"; he did not have his hand on the trigger. Defendant believed the gun might have hit his wife's chin. At any rate, she stopped and he turned to look at Robert Coulter, who was going out the door. As he turned his head, he felt the gun jerk away from him and off to the side and

go off. He assumed his wife had grabbed it. After being shot she passed out and defendant threw the gun down. Thinking Jeanie was dead, he panicked and got into his car and drove out into the country.

Defendant was pulled over and arrested about one hour later in Olney, Illinois. The police transported him to the jail where at 1:50 a.m.[1] IBI crime scene technician, R. L. Austin, gathered samples from the defendant's hands necessary for conducting a test known as neutron activation analysis (hereinafter referred to as N.A.A.). Dr. Edgar Rudzitis, research criminalist at the Joliet IBI crime laboratory, ran the test and prepared a report of its results and his conclusions. It is the results of this report which defendant claims were not properly disclosed to him.

Defendant also offered the testimony of Dr. John Bloxdorf, the pathologist who performed the autopsy on Mrs. Keith, in support of his theory as to how the gun came to be fired. Dr. Bloxdorf testified that there was a bruise on the back of the deceased's hand probably formed within four to five hours before her death.

In *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, the United States Supreme Court held that "* * * the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 10 L. Ed. 2d 215, 218, 83 S. Ct. 1194, 1196.

The Illinois courts have adopted the *Brady* rule (*e.g., People v. Hoffman*, 32 Ill. 2d 96, 203 N.E.2d 873; *People v. Dixon*, 19 Ill. App. 3d 683, 312 N.E.2d 390), and our supreme court has gone a step further in providing for the *pretrial* disclosure of such material pursuant to Supreme Court Rule 412(c) (Ill. Rev. Stat. 1975, ch. 110A, par. 412(c); see Committee Comments, Ill. Ann. Stat., ch. 110A, par. 412(c), at 681 (Smith-Hurd 1976); *People v. Parton*, 40 Ill. App. 3d 753, 354 N.E.2d 12; *People v. Elston*, 46 Ill. App. 3d 103, 360 N.E.2d 518).

Supreme Court Rule 412(c) (Ill. Rev. Stat. 1975, ch. 110A, par. 412(c)) states in pertinent part that:

> "[T]he State *shall disclose* to defense counsel any material or information within its possession or control which tends to negate the guilt of the accused as to the offense charged or would tend to reduce his punishment therefor." (Emphasis added.)

Recognizing the importance of having such information available to the defendant when his defense is being planned and prepared (*People v. Dixon*, 19 Ill. App. 3d 683, 688, 312 N.E.2d 390, 394; *People v. Parton*, 40 Ill. App. 3d 753, 758, 354 N.E.2d 12, 16), our courts have consistently

---

[1] During the early hours of October 31, 1976, there was a time change from daylight savings time to standard time. The hour of 1:50 a.m. expressed above is standard time; therefore, the samples were taken approximately 1½ hours after the shooting.

held that if favorable information has been improperly withheld the reviewing court will not speculate as to what use the defense could or would have put the evidence in question (*People v. Dixon*; *People v. Parton*; *People v. Elston*; *People v. Payne*, 44 Ill. App. 3d 502, 358 N.E.2d 409). Consequently, the usual disposition is to reverse the conviction and remand for a new trial, regardless of the prosecution's good or bad faith. As stated by the court in *Dixon*, "To hold otherwise would be to encourage conduct evasive of the rules requiring disclosure of evidence favorable to defendant." 19 Ill. App. 3d 683, 687, 312 N.E.2d 390, 393.

The State argues that it should not be found to have suppressed any evidence in view of the fact that they supplied a copy of Dr. Rudzitis' report in pretrial discovery, although illegible, and that defendant never sought prior to trial to obtain a more legible copy or to inspect the State's copy. The State also argues that the report is not exculpatory and therefore not covered by Supreme Court Rule 412(c).

After due consideration, we find that we must reject the arguments of the State and agree with defendant that the report's results were improperly disclosed.

The relevant facts with respect to the disclosure of the report are as follows.

On November 23, 1976, defendant's motion for discovery pursuant to Supreme Court Rule 412 was filed requesting, in pertinent part, that the State furnish:

"4. Any reports or statements of experts, made in connection with this particular case, including results of physical or mental examinations and of scientific tests, experiments or comparisons.

\* \* \*

8. Any information in the possession of the prosecution which would tend to negate the guilt of the accused as to the offense charged or would tend to reduce his punishment therefor as per Brady v. Maryland."

On February 15, 1977, the State responded to these portions of the discovery motion by attaching an illegible copy of Dr. Rudzitis' report of the results of the N.A.A. test to its response and by stating:

"8. The People do not possess any information that negates the guilt of the defendant or that would tend to reduce his punishment."

The defendant's trial began on March 29, 1977. On Monday, April 4, 1977, the State had two more witnesses to call to complete its case. Before either of these witnesses were examined, a hearing was conducted outside the presence of the jury. The defendant's counsel directed the court's attention to the instant discovery problem.

Defense counsel stated that during trial on the previous Thursday

(March 31, 1977), his wife deciphered the concluding lines of the illegible report. Subsequently, on Friday afternoon, counsel called R. L. Austin, the crime scene technician, and Mr. Austin read him the contents of the report over the telephone. (Mr. Austin had previously testified for the State without alluding to the N.A.A. test.) Prior to the Monday hearing, the State provided a legible copy to defense counsel.

The trial court was of the opinion that since the defense counsel might be able to overcome any disadvantage caused by the faulty discovery, no ruling with respect to the necessity of a new trial should be made until after defendant's evidence had been presented, should he then care to renew his motion. The defendant did renew the motion both at the close of all evidence and after trial; however, the court denied both motions.

Since reversible error will exist only if the report claimed to be improperly disclosed is favorable to the defendant, that is our first inquiry in this appeal. Dr. Rudzitis' report was directed to Howard Kirchoff, the chief of police of the Robinson Police Department. It states in part:

"Neutron activation analysis to determine the amounts of barium and antimony was performed on the contents of the submitted item. In this analyst's opinion, the results of this analysis show that the amounts of barium and antimony found were lower than those typically encountered after a firearm is handled or discharged; however, there are various reasons which could result in low amounts. Therefore, the results of this examination should be considered inconclusive."

The defendant offered the testimony of R. L. Austin and Dr. Edgar Rudzitis. Their testimony revealed pertinent information about neutron activation analysis in general and this test in particular.

Neutron activation analysis is a sophisticated test used to determine whether one has handled or fired a center-fire weapon, such as a .12 gauge shotgun. Basically, when this type of weapon is discharged, it blows back onto the weapon and the hands of anyone who has fired it certain amounts of the elements antimony and barium which are contained in the primer of the shell. If a person handles a fired weapon, abnormally high levels of these elements are deposited on the person's palms, and if he fires the weapon, the elements will be blown onto the backs of the hands. For purpose of his reports, Dr. Rudzitis considers an abnormally high reading to be one 10 times greater than what is normally found on one's skin. There are only two possible conclusions which may be reached by this examination, positive or inconclusive. If abnormally high amounts are found, the examiner concludes that the results are indicative of handling or firing a weapon, depending on the location of the readings. If the readings are within the normal range, the test is considered inconclusive because of the numerous ways by which the residue may be removed.

Basically, any physical contact with the skin tends to remove these elements. Rubbing, wiping, washing, driving a car or putting the hands in one's pocket would all tend to remove some of the residue.

With respect to the analysis of the specimens taken from defendant's hands, the amounts found were lower than normally encountered when one has fired a gun and the test was therefore considered inconclusive. In fact, when testifying with respect to a graph prepared from defendant's readings, Dr. Rudzitis indicated that the back of defendant's right hand revealed an exactly normal level of antimony and a below normal level of barium as compared to amounts commonly found on all persons.

During his testimony, the defendant mentioned several things that might have affected the amounts of antimony and barium on his hands when the specimens were taken 1½ hours after the incident: (1) driving his car; (2) putting his left hand in his pocket to pay for some gas he purchased before his arrest; (3) riding to the police station with his hands handcuffed behind him (defendant testified he sat forward so as not to touch the seat and cause himself pain); and (4) emptying his pockets at the station by putting a hand in each pocket once only. On cross-examination of Dr. Rudzitis, the prosecutor presented a hypothetical question to the doctor which assumed most of the above activities and asked his opinion as to whether an indicative reading could be obtained under such circumstances; the doctor refused to state an opinion.

■■ The State basically argues that since the analysis results were "inconclusive," the report could not be material favorable to the defendant. We disagree.

As Dr. Rudzitis' testimony shows there is only one "negative" finding and that is denominated "inconclusive." The inconclusive finding would apply as well to specimens from one who never fired a gun as to one who had fired a weapon but had somehow removed the telltale particles. Moreover, defendant's defense at trial was that the gun was discharged accidentally by the victim, that he did not have his hand on the trigger or fire the gun; the report and its underlying data were consistent with this theory. The levels of antimony and barium found on the back of his right hand were not indicative of the firing of a weapon and could be interpreted as being supportive of defendant's testimony.

It has already been noted that the credibility of the respective accounts of the incident of defendant and the Coulters was of the utmost importance in this case. It does not take much imagination to see the advantage of being aware of the import of this report prior to the trial's commencement. Although the State did furnish a copy of the report to defense counsel prior to trial in response to his request for the results of scientific tests, we believe that the peculiar circumstances found here do present a violation of defendant's rights to discovery.

■■ There is no question that the copy of the report provided to the defendant was illegible. It could not put him on notice as to the possible uses which it might have for his defense. We are not holding that the defendant is relieved from all responsibility to ascertain the contents of an illegible report supplied in discovery or that the State must always be held responsible for clerical errors in discovery materials; however, when such illegible material tends to negate the defendant's guilt as to the offense charged and the State asserts that it does not possess any information that tends to negate defendant's guilt or would tend to reduce his punishment, the State has violated the discovery obligation imposed upon it by Supreme Court Rule 412(c) (Ill. Rev. Stat. 1975, ch. 110A, par. 412(c)). The State, in effect, led the defendant to the erroneous belief that the illegible report could not be helpful in his defense. Since the good or bad faith of the prosecution is irrelevant when favorable material has been improperly disclosed (*Brady v. Maryland; People v. Dixon*), it is no excuse that the illegible copy was inadvertently supplied or that the prosecution actually believed that the report did not tend to negate defendant's guilt of murder.

The State argues that any error with respect to discovery is harmless in view of the fact that the defendant presented extensive evidence concerning the test. Essentially, this is an assertion that since defendant learned about the material at trial rather than after trial, the error is harmless. We cannot agree.

We are aware of three cases in which the defendant became aware of the improperly disclosed evidence at trial before presenting his defense; they are *People v. Elston; People v. Parton;* and *People v. Pinchott,* 55 Ill. App. 3d 593, 370 N.E.2d 1289. In *Elston* and *Parton* the courts reversed the convictions and remanded the causes for new trials. The court in *Pinchott,* however, affirmed the conviction. After careful consideration, we conclude that *Pinchott* is distinguishable from this case and that reversal is the proper disposition here.

In *Elston* the defendant was found guilty of armed robbery and attempt murder. The question of the identification of defendant was of great importance. Defendant learned for the first time at trial that two of the five occurrence witnesses who testified at trial had misidentified the culprit at a lineup and that another two had been unable to make any ·identification. Although the defendant used the witnesses' inability to make an identification or their misidentification at the lineup to impeach the in-court identification by those witnesses, the court, citing *Dixon* and *Parton,* reversed the convictions stating:

> "We cannot say that defendant would not have been able to make other even more effective use of the favorable information had he

been timely given the discovery to which he was entitled." 46 Ill. App. 3d 103, 106, 360 N.E.2d 518, 520.

Considerations of a similar import are contained in the language of the court in *Parton:*

"The error involved in withholding evidence from discovery is not dependent on an affirmative showing by the defendant that he was prejudiced in fact. *People v. Nichols* (1976), 63 Ill. 2d 443, 349 N.E.2d 40.

\* \* \* If this court cannot know the purposes to which the defendant and his counsel would put the undisclosed evidence, it cannot be said such error is harmless. [Citations.]" 40 Ill. App. 3d 753, 758, 354 N.E.2d 12, 16.

The court in *Pinchott,* while recognizing the above-quoted rule of *Parton,* held that "on the basis of the facts and circumstances" presented therein the error was harmless. (55 Ill. App. 3d 593, 597-98, 370 N.E.2d 1289, 1292.) This holding was correct since it was apparent that defendant could make *no* use whatsoever of the withheld evidence.

In *Pinchott* the State failed to disclose the participation of a confidential informant to the alleged drug transaction for which defendant was being prosecuted. This failure was the result of an intentional policy of concealment by a law enforcement agency. The identity of the informant was subsequently revealed during the testimony of a State witness. After the prosecution rested, the court granted defendant a two-day continuance in order to allow him to interview the informant. An interview was conducted; however, defendant did not call the informant either as his witness or a court's witness. Under these circumstances, the court was compelled to assume that the informant could not provide any testimony helpful to the defense. The court was not speculating as to the purposes to which defendant would put the undisclosed evidence since it was manifest that there were no purposes to which it could be used.

In this case, however, the defendant did make use of the material evidence erroneously withheld from him, and, as in *Elston,* we cannot say that defendant would not have been able to make other even more effective use of the information had he been given a legible copy of the report in discovery. One possibility is that he could have obtained favorable expert testimony.

Because of the factual situation presented in this case, our determination that a new trial is required as a result of the insufficient discovery provided defendant compels this court to consider the effect the former jeopardy doctrine will have upon a new trial.

■■ ■ As we have already noted, defendant was initially charged with

murder. This case, however, was submitted to the jury with instructions as to offenses of murder, voluntary manslaughter and involuntary manslaughter, and the jury found defendant guilty of involuntary manslaughter. By operation of law, this conviction had the effect of an acquittal of the graver charges of murder and voluntary manslaughter. (*People v. Echoles,* 36 Ill. App. 3d 845, 344 N.E.2d 620; *People v. Dugan,* 15 Ill. App. 3d 1071, 305 N.E.2d 308; Ill. Rev. Stat. 1975, ch. 38, par. 3—4(a).) The doctrine of former jeopardy bars any further prosecution on the greater offense and requires that defendant be retried only for involuntary manslaughter. (*People v. Bolden,* 103 Ill. App. 2d 377, 243 N.E.2d 687. See also *People v. Echoles; People v. Dugan.*) If defendant were tried again for murder or voluntary manslaughter, charges of which he has already been impliedly acquitted, he would be twice put in jeopardy for the same offense in violation of provisions of our constitution. Ill. Const. 1970, art. 1, §10.

For the foregoing reasons, we reverse the judgment of the circuit court of Jefferson County and remand this cause for a new trial on the offense of involuntary manslaughter.

Reversed and remanded.

FRIEDMAN, J., concurs.

Mr. JUSTICE KARNS, dissenting:

Because I cannot agree that the discovery obligation of Supreme Court Rule 412(c) (Ill. Rev. Stat. 1975, ch. 110A, par. 412(c)) has been violated in the instant cause, I must respectfully dissent.

Rule 412(c) requires the State to disclose to defendant "any material or information within its possession or control which tends to negate the guilt of the accused as to the offense charged* * *." I cannot agree that Dr. Rudzitis' findings were necessarily favorable to the defendant nor material to his guilt. As the majority correctly points out, an inconclusive finding would apply to specimens from one who never fired a weapon as well as to one who had fired a gun but had somehow removed the increased amounts of barium and antimony from his hands. Nevertheless, I do not believe that an inconclusive test result can be so equated with innocence as to term it exculpatory. A more substantial showing that the State withheld evidence favorable to the defendant is required, in my opinion, to justify reversal on this ground.

Furthermore, defendant admitted he had the gun in his hand. Defendant was not convicted of murder, but involuntary manslaughter. The mental state in involuntary manslaughter is a reckless act, not an intentional or knowing act.

More importantly, the test results were made available to the defendant at the time of his request when his defense was being planned and prepared. Although the copy of Dr. Rudzitis' report which was supplied by the State was illegible, it was never withheld and a more legible copy was not sought by the defendant until after trial had commenced. I am not persuaded that the State should suffer from defendant's failure to complain of any error at an earlier stage. It would appear that counsel did not attempt to read the report until trial had commenced as he was then able to determine its significance. This is not a question of the good faith or bad faith of the State; rather, the focus should be on the State's compliance with the request and the untimeliness of the defendant's demand for a more legible copy.

I would affirm the judgment of conviction of the trial court.