THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLIAM BYRD, Defendant-Appellant.

First District (4th Division)    No. 79-1473

Opinion filed November 13, 1980.

James J. Doherty, Public Defender, of Chicago (John E. Horn and Donald Honchell, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Kathleen Warnick, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ROMITI delivered the opinion of the court:

The defendant was arrested for armed robbery and for the murder of Allen Chester. He confessed to the crime, was found guilty and was sentenced to serve 14 years in the penitentiary. He has appealed, contending that the trial court erred in refusing to suppress his statement made to an assistant state's attorney on the grounds the statement was involuntary. We affirm.

The defendant, William Byrd, and a companion, Sharyn Nelson, were arrested at about 2:30 p.m. on December 15, 1977, because they fit the descriptions of two people wanted in connection with the homicide of Allen Chester four days earlier. Early the next morning, Delphine Nelson was also arrested. All three made formal statements; all three sought to have the statements suppressed as involuntary mainly on the grounds they had been suffering from drug withdrawal at the time they were made.

At the hearing on the motion Officer Radigan testified that he and his partner arrested the defendant at about 2:30 p.m., December 15, 1977. The defendant was transported to the police station where Officer Radigan advised him of his *Miranda* (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602) rights. The defendant indicated that he understood those rights. He made no statement to the officer.

Officer Hickey testified that he first saw the defendant at about 4 p.m., December 15, 1977, in an interview room at the police station. He read the defendant his rights. The defendant did not indicate that he wanted a lawyer. Defendant told him that that [murder] was not "his thing"; he was a "con man"; he did not kill people. Officer Hickey denied that either he or anyone in his presence caused any physical harm to the defendant. He also testified that he did not make any promises of leniency to the defendant.

Defendant was taken to his cell in the lockup by 5 p.m. He was there until 2:30 the next morning. Hickey did not see or talk to the defendant during that time.

Hickey next saw defendant at about 2:30 a.m., December 16, 1977, in an interview room at the station. He again read the defendant his rights. Defendant asked Hickey for "a fix." Hickey told defendant they could not oblige him. Hickey did not seek any medical aid for defendant. At that time defendant appeared alert. He was not shaking. Hickey had no knowledge of defendant's sweating. He also could not recall noticing any needlemarks on the defendant's hands or arms. Defendant did not make a second request for "a fix."

Hickey also testified that between 5 p.m. on December 15 and 2:30 a.m. on December 16 he had no occasion to bring food or drink to the defendant or see him eat or drink. He also did not know if defendant made any phone calls during that time period. He was not handcuffed during that period. At the beginning of the 2:30 a.m. conversation, Hickey informed the defendant that two of his companions who had also been arrested had made oral statements implicating him.

There was a third conversation at about 5:55 that morning, at which time defendant made his statement to the court reporter. The assistant state's attorney present read him his rights. Officer Hickey also testified that for a person to appear in court on a particular morning, the police must finish processing the person by 3 or 4 a.m.

Officer John Byrne testified that he was present during both December 16 conversations with the defendant. Defendant did not appear to be in any distress, and he did not make any complaint. Byrne did not recall defendant sniffing. He was not shaking or sweating during the 2:30 a.m. interview. Likewise Byrne did not notice anything irregular or any needlemarks or trackmarks on defendant's hands. At no time in Byrne's presence did defendant ask for "a fix."

Byrne was one of the officers who escorted defendant from the lockup to the interview room for that first morning interview. While going to the interview room defendant did not indicate to him or to anyone else that he wanted a lawyer. He was advised of his rights at both interviews. Byrne stated he did not see any water or liquid to drink in the interview room. He also did not know if defendant was advised that he was entitled to make a phone call.

Officer Davies testified that he saw the defendant on December 15 and was present at the interviews on December 16. Officer Davies did not notice whether any food was offered to the defendant in the interview room; he also did not notice if there was anything for him to drink in the interview room. Davies did not know whether defendant made any phone calls. He did not notice any trackmarks or needlemarks on defendant's hands or arms.

Officer Davies further testified that after he was arrested the defendant did not ask the witness or any other officer for an attorney. At the 2:30 a.m. interview Officer Davies advised defendant of his rights. At the second interview the assistant state's attorney advised him of his rights.

It was stipulated that assistant state's attorney Hyman read the defendant and his companions their constitutional rights before he took statements from them and that they understood those rights. It was further stipulated that they made no complaints and that in his opinion they were not suffering from narcotic withdrawal. No one complained about any distress.

It was also stipulated that the court reporter would testify that he did not observe any of the three going through what is called narcotics withdrawal.

The defendant testified that after he was arrested and brought to the police station he was handcuffed to a wall in the interrogation room. Officers Hickey and Byrne advised him of his rights. Defendant understood what they were saying. He told them he did not want to make a statement. He also asked for some water but did not receive any. Sharyn Nelson also saw him during this time but he did not recall what was said or done except that Sharyn told him the police officers had asked her to cooperate with them. After Sharyn left, defendant was taken to the downstairs lockup by Officer Hickey. He was charged with unauthorized use of a weapon.

When Officers Hickey and Byrne came back downstairs, he told them he was feeling kind of tired, he was sick and he asked for a lawyer. He was told it would be a waste of the State's money to obtain a lawyer at that time. They also told him that if he cooperated with them he would get some drugs. This promise was repeated by Officer Hickey in the interrogation room after defendant again told them he was sick, he wasn't feeling good, he was nervous, and he needed a fix. He made the formal statement because of this promise. Defendant had been taking drugs for 17 years. During December he had been taking Talwin and Parabenzamine intravenously three or four times a day. The judge was shown the marks on defendant's arms and hands. During the 2:30 a.m. interrogation defendant was sweating a little, he was "shaky nervous" and was having a little convulsion in his stomach. He had not had drugs since the night of December 14.

During the 2:30 a.m. interrogation, the police officers also told defendant they had two statements which involved him in the crime and told him in general what was said in the other two statements.

Defendant further testified that prior to his giving the statement to the court reporter he had not received anything to eat, drink or smoke. After he made the statement he was given some water and a baloney sandwich. This was the first food and drink he had since his arrest. He later admitted, however, that he did have some water to drink while he was in the lockup from "a very nasty sink" there. He also admitted that he never asked for anything to eat. Likewise, while he stated that he did not receive any medical attention, he admitted that he only asked for "a fix." The police officer never gave him any drugs. He also admitted that he told the assistant state's attorney that the police had treated him well and he did not tell him the police had promised him "a fix," or that he needed one, or that he wanted some water.

Defendant further testified that he had not slept during the time he

was arrested until he was transported to the jail. He had not been able to sleep because he was restless because he was ill and because the police kept coming into the interrogation room when he was standing up. He also stated that he was not told he could make a phone call. Defendant was not taken to court until December 17.

Sharyn Nelson testified that she was arrested about 2:30 p.m. She, the defendant, Delphine and Roosevelt Warfield had gone to the particular address to buy drugs when she and Byrd were arrested. She was suffering from withdrawal when she was arrested.

She saw the defendant about 4:30 p.m. December 15. She had asked to see him because she wanted to find out what the police were saying to him. He looked ill; he was sweating. He was handcuffed to the floor or to the wall. She told the defendant that the police told her that if she cooperated they would only charge him with having a gun. He did not say anything except that he wasn't feeling well.

The trial court after hearing the evidence determined that their use of narcotics and any statements about narcotics did not contribute to their waiver of their rights. He further found that the facts were as testified to by the various police officers and, that based on that finding of fact, the motions to suppress the statements were denied.

At a stipulated bench trial the defendant's statement, the testimony from the hearing on the motion to suppress and the stipulated testimony of Frederick Rutledge were admitted. Rutledge had heard noises and screaming coming from the apartment of Allen Chester on December 11, 1977. He saw Byrd running from the apartment carrying property. The trial judge found the defendant guilty. The defendant on appeal has only contended that the trial court improperly denied his motion to suppress. The sufficiency of evidence at trial is not in issue.

Defendant contends that his statement was involuntary for the following reasons: he had not been allowed to eat, sleep, drink except for some water from a sink in the lockup, make a phone call, or receive medical attention, was held incommunicado for over 15 hours; the police applied subtle but impermissible coercion in allowing Sharyn Nelson to visit him; he was suffering from drug withdrawal and was in pain; and, finally, he was not brought before a court until December 17.

■■■ The evidence does not support the defendant's contention. The police did not prevent the defendant from eating and sleeping. While the police may not have offered him anything to eat, the defendant admitted that he did not ask for anything to eat. (Compare *People v. Walker* (1977), 45 Ill. App. 3d 627, 360 N.E.2d 64, *appeal denied* (1977), 66 Ill. 2d 627.) He could and did drink from a sink in the lockup. He was given ample opportunity to sleep since he was left in the lockup from approximately 5 p.m. December 15 to 2:30 a.m. December 16. He testified that

he could not sleep because he was too restless. Where a defendant is given sufficient opportunity to rest and sleep, any excessive fatigue is simply a factor to be considered by the trial court *(People v. Pittman* (1973), 55 Ill. 2d 39, 302 N.E.2d 7), and a statement is not considered involuntary simply because the defendant was tired. *(People v. Newman* (1966), 66 Ill. App. 2d 321, 214 N.E.2d 333.) While there was evidence that the police did not inform the defendant of his right to make any phone calls, there was absolutely no evidence that the defendant was unaware of this right, that he asked to make any phone calls or was otherwise held incommunicado. Likewise, the defendant admitted that while he asked for "a fix," he did not ask for medical attention. The visit from Sharyn Nelson was not prompted by the police but was made at her request so that they could compare information.

■■ The trial judge determined that the defendant did use narcotics. However, he also determined that the defendant's use of narcotics and any statements about narcotics did not contribute to his waiver of his rights. In light of the fact that only the defendant and his co-defendant, Sharyn Nelson, testified that he was suffering from withdrawal, that the police officers, assistant state's attorney and court reporter all agreed that, contrary to defendant's testimony, he was showing no signs of withdrawal and that defendant made no complaint to the assistant state's attorney, the trial court's determination must be upheld. *(People v. Gorham* (1978), 66 Ill. App. 3d 320, 384 N.E.2d 6, *appeal denied* (1979), 74 Ill. 2d 588.) The direct conflict between the facts related by witnesses for the defense and those testified to on behalf of the People was essentially a question of the credibility of the witnesses best resolvable by the trial court, whose determination must be sustained unless contrary to the manifest weight of the evidence. *People v. Higgins* (1972), 50 Ill. 2d 221, 278 N.E.2d 68, *cert. denied* (1972), 409 U.S. 855, 34 L. Ed. 2d 100, 93 S. Ct. 195.

■■ Furthermore, the mere existence of pain is not sufficient to render a statement involuntary. *(People v. Walden* (1976), 43 Ill. App. 3d 744, 357 N.E.2d 232.) Even accepting defendant's testimony that he was sweating a little, he was "shaky nervous," he was having a little convulsion in his stomach, there was no evidence that the pain suffered by defendant was of such nature as to overcome his ability to understand either the *Miranda* warnings or the implications of his statement *(People v. Walden* (1976), 43 Ill. App. 3d 744, 357 N.E.2d 232); indeed, defendant admitted that he understood the warnings.

■■ Finally, while the police did wait for two days before bringing defendant before the court, he made his statement 15 hours after arrest. A delay occurring after a statement is made will not relate back so as to make the statement involuntary. *(People v. Musil* (1967), 37 Ill. 2d 373,

227 N.E.2d 751.) There is no indication here that the delay in any way contributed to the making of the statement. *People v. Higgins* (1972), 50 Ill. 2d 221, 278 N.E.2d 68, *cert. denied* (1972), 409 U.S. 855, 34 L. Ed. 2d 100, 93 S. Ct. 195.

Accordingly the judgment of the trial court is affirmed.

Affirmed.

LINN, P. J., and JOHNSON, J., concur.