THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
THOMAS C. MILNER, Defendant-Appellant.

Third District   No. 3—83—0304

Opinion filed April 19, 1984.

HEIPLE, J., concurring in part and dissenting in part.

Robert Agostinelli and Peter A. Carusona, both of State Appellate Defender's Office, of Ottawa, for appellant.

John A. Barra, State's Attorney, of Peoria (John X. Breslin and Patricia Hartmann, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE SCOTT delivered the opinion of the court:

The defendant, Thomas C. Milner, appeals following a jury trial in the circuit court of Peoria County which returned verdicts of guilty for the offenses of murder, involuntary manslaughter, aggravated battery of a child and concealment of a homicide. Judgment of conviction was entered for murder and the defendant was sentenced to an extended term of imprisonment for 46 years. A consecutive sentence of five years was imposed for the offense of concealment of a homicide.

The issues presented for review include allegations that: (1) the trial court erred in refusing to suppress defendant's confession; (2) that evidence of uncharged crimes was improperly admitted over defendant's objection; (3) that the evidence was insufficient to prove the *corpus delicti* beyond a reasonable doubt; (4) that defendant's statement to the police admitting that his son's death may have resulted from a criminal act was not corroborated by sufficient independent proof of the *corpus delicti*; (5) that the defendant was improperly sentenced for murder since the jury's finding of guilt for involuntary manslaughter negated the required mental state for murder; (6) that defendant's conviction for murder must be reversed since it was not proved beyond a reasonable doubt that defendant knew his

acts created a strong probability of death or great bodily harm; and (7) that the trial court erred in refusing to instruct the jury on the issue of negligence.

The evidence indicated that on December 9, 1982, at approximately 7 p.m., several police officers went to an apartment occupied by Annette Robinson and the defendant. Ms. Robinson, the defendant and three children were at home. The police remained in the apartment until approximately 8:30 p.m. when they arrested Ms. Robinson and took her to the police station. The children were placed in protective custody.

While at the apartment the police searched for, but failed to locate, the defendant's son, Shamar Milner. At one point the defendant attempted to leave to purchase medicine but the police told him it would be best if he remained in the apartment. The defendant was not taken into custody but was asked to come to the police station. The police left the defendant in the apartment after he told them that he would come to the station later.

At approximately 9 p.m. the defendant arrived at the rear door of the police station carrying a duffel bag. The defendant indicated that the bag contained his son, Shamar. The coroner subsequently examined the bag and found the body of a badly decomposed infant. The defendant was read his *Miranda* rights, and he agreed to talk to the police.

The defendant was taken to an interview room and questioned for 35 minutes. He then accompanied the police back to his apartment and showed them a demolished building where he initially had placed his dead son.

The defendant and the police returned to the station where he agreed to make a written statement which began at 11:13 p.m. At 12:06 a.m. the statement was interrupted when the defendant stated that he was tired and could not answer any more questions. The defendant became emotional and started to cry.

Specifically, the colloquy was as follows:

"Q. Why did you leave [the apartment]?

A. Couldn't leave him outside.

Q. Couldn't leave who outside?

A. I'm tired, I can't answer no more. I couldn't leave my son outside."

The police told the defendant that they would take a break to allow him to compose himself. During the break there was general conversation, the defendant was permitted to relax and was offered coffee and cigarettes. The defendant was also left alone for a few

minutes.

At approximately 12:15 a.m. the police and their stenographer returned to the interrogation room and the defendant was asked if he felt up to going on with his statement. The defendant replied that he was willing to do so, and he was told that his rights were still in effect.

The interrogation resumed and the defendant was questioned until 12:52 a.m. At this point the police conferred with legal counsel and allowed the defendant to read over his statement.

At 2:21 a.m. the interrogation resumed after the defendant said he felt up to answering a few more questions. The defendant was again told that his rights were still in effect and could be exercised at any time. He was questioned until 2:36 a.m.

The defendant's statement indicated that around October 15, 1982, he had been trying to teach his 15-month-old son, Shamar, to stand. When the defendant's initial efforts failed, he tied Shamar to a board to teach him to stand upright. The child began to cry at being restrained so the defendant untied him. However, when the child continued to cry the defendant became angry and shook him two or three times, the last two shakes being hard. The child was then put to bed. During the night the defendant discovered that his son had a fever so he gave him a cool bath and put him back to bed. In the morning the defendant checked his son's condition and he was dead. The defendant did not tell anyone. He dressed the child and wrapped him in a blanket. He told the child's mother that he was taking him to his mother's house.

The defendant took his son's body to an abandoned building where he laid him down and undressed him. He then burned the child's clothing. However, three or four days later the defendant recovered the body and brought it back to the apartment where it remained in a bag on a shelf in the bathroom until the police arrived December 9. In the interim the defendant burned incense to mask the odor.

An autopsy indicated there were no signs of trauma, but due to the degree of decomposition, no cause of death could be found. The coroner's physician testified that a child of Shamar's age could be killed by shaking; however, there were other possible causes of death as well.

Evidence of defendant's involvement in what were believed to be other offenses was then admitted over defendant's objection. Specifically, evidence was elicited which indicated that Shamar's twin sister had suffered a fractured arm and knees in 1981. The defendant had

given the police a statement that another child had jumped off a window ledge onto Tamara, Shamar's twin sister, thereby injuring her. The defendant also admitted shaking the child hard enough to injure her.

Shirley Terry testified that her son Cory had died in 1975 and that the defendant was the child's father. Cory had been left in the defendant's care and that he died when the defendant said the child had fallen off his bed. An autopsy indicated that Cory had died from a brain hemorrhage which could have been caused from a fall, but a more common cause for such an injury would be repeated shaking. The autopsy also revealed several healing fractures of Cory's ribs which had occurred prior to the alleged fall of the child.

Additional evidence was introduced which indicated that X rays of Tamara revealed a spiral fracture of the humerus and small chip fractures of both knees. The spiral fracture was in the same area as the one found on Cory, which resulted from twisting force, such as holding a child by his arms and shaking him.

Dr. Shipley, a radiologist at St. Francis Hospital, believed that these injuries were the "hallmark" of a battered child.

The X rays taken of Shamar indicated that he had injuries which were similar to those of Tamara and Cory, *i.e.*, healing rib fractures, chip fracture of left scapula.

As previously stated, the defendant's first allegation of error concerns the trial court's refusal to suppress the defendant's confession.

The facts and circumstances surrounding the interrogation of the defendant indicate that the defendant voluntarily presented himself at the police station carrying his son's body in a bag. The defendant had not been taken into custody when the police arrived at the apartment. The defendant was advised of his *Miranda* rights, which he indicated he understood. The defendant's statement to the police after the interrogation had begun, *i.e.*, "I cannot answer no more" was made during a period of time when the defendant was emotionally upset due to his son's death and that he doubted under those circumstances whether he could go on answering questions. The statement must be examined in the factual context of its utterance. See *People v. Aldridge* (1979), 68 Ill. App. 3d 181, 385 N.E.2d 396, *aff'd* (1980), 79 Ill. 2d 87, 402 N.E.2d 176 (defendant indicated, "I think you got enough" held insufficient to constitute invocation of right to remain silent, but merely reluctance to give details).

We believe the context of the defendant's statement here is analogous to that of *Aldridge* in that it was not a request to terminate questioning but an indication by the defendant that he believed he

couldn't continue to answer questions *at that time* due to his emotional state.

▇▇ The record indicates that when the defendant was given the opportunity to rest and compose himself, he readily agreed to continue talking to the police. A statement is not to be considered involuntary merely because a defendant is tired. (*People v. Byrd* (1980), 90 Ill. App. 3d 429, 413 N.E.2d 148; *People v. Pittman* (1973), 55 Ill. 2d 39, 302 N.E.2d 7.) For these reasons, we believe the trial court's refusal to suppress the defendant's confession was correct.

Next, the defendant contends that the trial court erred in admitting evidence of alleged but uncharged incidents of child abuse to defendant's children. The defendant contends that the injuries suffered by the children were not established to have resulted from child abuse as opposed to natural causes, and in addition, even if the injuries resulted from child abuse, there was an insufficient showing that the defendant was the child abuser.

The defendant correctly argues that evidence of other crimes is inadmissible if it only tends to establish the defendant's propensity to commit crimes. *People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238.

Despite the foregoing policy of protecting the accused against unfair prejudice, several exceptions have been created to the general rule prohibiting evidence of other crimes, *i.e.*, such evidence is admissible if it establishes either motive, intent, identity, absence of mistake or *modus operandi*. (*People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489.) Although it must be shown that a crime occurred and the accused committed it or participated in its commission, the proof of other crimes need not be established beyond a reasonable doubt. *People v. Walters* (1979), 69 Ill. App. 3d 906, 387 N.E.2d 1230.

Over defense objection, the trial court admitted evidence that three of defendant's children, Shamar included, had all on prior occasions been the victims of child abuse at the defendant's hands, *i.e.*, injuries derived from the children being severely shaken by the defendant. A limiting instruction (Illinois Pattern Jury Instruction, Criminal, No. 3.14 (2d ed. 1981)) was given which instructed the jury that they could consider these other occurrences for the limited and sole purpose of establishing defendant's design and knowledge. See *People v. Holland* (1973), 11 Ill. App. 3d 591, 297 N.E.2d 310 (evidence of other crimes admissible to show general scheme of defendant's continued course of conduct).

Without restating the evidence of alleged child abuse to each child, namely the twins, Shamar and Tamara, and Cory Parker, each

had similar injuries and the defendant had admitted shaking Shamar and Tamara hard enough to injure them. Cory's death occurred without any admissions from the defendant, but the medical evidence tended to contradict the defendant's version of how Cory died, namely a fall from his bed.

While we are not disposed to say that the evidence established the defendant's guilt in the other instances of child abuse beyond a reasonable doubt, it is clear that the defendant had an admitted history of either manhandling small children or being the only one present when they died from injuries which were not derived from the defendant's version of their origin.

The prior instances of child abuse were relevant to prove: (1) recklessness, to sustain the charge of involuntary manslaughter (*People v. Garcia* (1981), 95 Ill. App. 3d 792, 420 N.E.2d 482; *People v. Platter* (1980), 89 Ill. App. 3d 803, 412 N.E.2d 181); (2) that allegedly defendant knew his act of shaking Shamar created a strong probability of death or great bodily harm, an element required to sustain the charge of murder (*People v. Drumheller* (1973), 15 Ill. App. 3d 418, 304 N.E.2d 455); (3) *corpus delicti, i.e.,* that Shamar's death was caused by a criminal agency put into motion by the defendant (*People v. Platter*); (4) to exclude possible innocent causes for Shamar's death (*People v. Huff* (1963), 29 Ill. 2d 315, 194 N.E.2d 230); (5) common design or purpose (*People v. Johnson* (1982), 107 Ill. App. 3d 156, 437 N.E.2d 436).

Next, the defendant contends that his convictions for murder, involuntary manslaughter, and concealment of a homicidal death should be reversed because the *corpus delicti* was not proved beyond a reasonable doubt, *i.e.,* the *corpus delicti* of a criminal homicide being the fact of death and the criminal agency of another. *People v. Kent* (1982), 111 Ill. App. 3d 733, 444 N.E.2d 570.

The defendant contends that the only element of the *corpus delicti* proved by the evidence was the fact of death. The defendant argues that it was not shown beyond a reasonable doubt that the defendant's shaking of Shamar caused his son's death. Specifical'y, the defendant argues that although there was medical testimony that a child of Shamar's age could be killed by shaking, there was no medical evidence which positively concluded that Shamar's death resulted from the defendant's shaking him. However, it is well settled that expert testimony is not required to prove the cause of death. (*People v. Jones* (1961), 22 Ill. 2d 592, 177 N.E.2d 112; *People v. Brown* (1967), 83 Ill. App. 2d 411, 228 N.E.2d 495; *People v. Davidson* (1967), 82 Ill. App. 2d 245, 225 N.E.2d 727.) The *corpus delicti* may be established

despite the inconclusiveness of the medical testimony as to the cause of death. *People v. Ellison* (1981), 100 Ill. App. 3d 282, 426 N.E.2d 1058; *People v. Brechon* (1979), 72 Ill. App. 3d 178, 390 N.E.2d 626.

When the facts and circumstances of this case are examined in light of the injuries sustained by the decedent, both prior to and immediately preceding his death, the inescapable circumstantial evidence clearly supports the jury's determination that the child died as a result of the defendant's actions. The degree of defendant's culpability (murder or manslaughter) will be addressed later.

In addition, the defendant's subsequent actions of concealment, lying about the child's whereabouts, hiding the body and burning his clothes, clearly support the fact that Shamar died by criminal as opposed to innocent means. *People v. Avery* (1980), 88 Ill. App. 3d 771, 410 N.E.2d 1093; *People v. Lopes* (1974), 17 Ill. App. 3d 986, 309 N.E.2d 108; *People v. Watson* (1982), 103 Ill. App. 3d 992, 431 N.E.2d 1350.

For these reasons, we must also reject defendant's contention that his statement to the police that his son's death may have been caused from his criminal acts was not corroborated by sufficient independent proof of the *corpus delicti*. The medical evidence of the decedent's injuries, while not conclusive standing alone, clearly corroborated the defendant's statement that his son died as a result of the defendant's actions. The trier of fact is not required to search out a series of potential explanations compatible with innocence and elevate them to the status of a reasonable doubt. *People v. Huff* (1963), 29 Ill. 2d 315, 194 N.E.2d 230.

Next the defendant contends that the trial court erred in entering judgment on the guilty verdict of murder since the jury's finding of guilt with respect to the charge of involuntary manslaughter negated the required mental state for murder. (*People v. Fox* (1983), 114 Ill. App. 3d 593, 449 N.E.2d 261; *People v. Stuller* (1979), 71 Ill. App. 3d 118, 389 N.E.2d 593; *People v. Keith* (1978), 66 Ill. App. 3d 93, 383 N.E.2d 655; *People v. Bolden* (1968), 103 Ill. App. 2d 377, 243 N.E.2d 687; *People v. Carrico* (1923), 310 Ill. 543, 142 N.E. 164; and *People v. Kendricks* (1984), 121 Ill. App. 3d 442.) The foregoing citations are concerned with cases which hold that a conviction of manslaughter, whether it be voluntary or involuntary, negates a finding that the defendant was guilty of murder. The cases of *Keith, Bolden,* and *Carrico* pertain to the offense of involuntary manslaughter. The basic difference between involuntary manslaughter and murder is the mental state which accompanies the conduct causing the homicide. To sustain a conviction for murder there must be sufficient evidence from which

it can be inferred that defendant either intended to kill or knew of the strong probability of death or great bodily harm. Involuntary manslaughter is established when the acts which caused death are done recklessly and a person acts recklessly. (See *People v. Gresham* (1979), 78 Ill. App. 3d 1003, 398 N.E.2d 398.) Murder requires specific intent to kill, while involuntary manslaughter is predicated upon evidence showing that an act which caused a death was committed in a reckless manner. The element of recklessness negates any finding of intent necessary to support a conviction for murder.

We note that in the dissent filed in this case there is an attempt to circumvent the rule that a finding of guilt as to the crime of manslaughter is tantamount to an acquittal of the offense of murder by making a distinction between the crimes of voluntary and involuntary manslaughter. As we have previously noted, cases cited by reviewing courts have made no such distinction.

In the dissenting opinion it is further argued that involuntary manslaughter is a lesser included offense of murder and hence the conviction of the lesser offense should be set aside and the conviction of the graver offense, being murder, should be permitted to stand. In support of this argument the case of *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, is cited. We question the applicability of *King* to the instant case. *King* is concerned with the imposition of consecutive or concurrent sentences for different offenses arising from multiple acts which are incidental to or motivated by some greater criminal objective. The dissent does not argue that two sentences should be imposed but relies on *King* in arguing that involuntary manslaughter is a lesser included offense of murder and that the sentence imposed upon the charge of murder by the trial court should be upheld.

We acknowledge that the case law on the subject as to whether manslaughter is a lesser included offense of murder has created a murky picture. Some cases have stated that manslaughter is a lesser included offense, while others have referred to manslaughter as a lesser offense, or an offense not being as grave as the offense of murder. In attempting to classify the offenses of manslaughter the language found in the cases has been used quite loosely. Because of the simple fact that murder can be committed only when a person acts intentionally or knowingly, while the commission of manslaughter requires no mental state but is concerned only with conduct, we disagree with the views of the dissent that it is a lesser included offense of murder. (See O'Neill, *Murder Least Foul*, 72 Ill. B.J. 306 (1984).) The article further states, "It [voluntary manslaughter] is a crime no

one could ever deliberately intend to commit, but is rather an after-the-fact characterization of a defendant's actions. It is a homicide less serious than murder; *yet it is not a lesser-included offense* \*\*\*." (Emphasis added.)

We are mindful of the recent case of *People v. Hoffer* (1984), 122 Ill. App. 3d 13. In *Hoffer* the reviewing court rejected a contention that a manslaughter conviction constituted an implied acquittal of murder. The decision in *Hoffer* is in conflict with preceding cases. The court in *Hoffer* attempts to distinguish the case of *Stuller* since in the latter case an instruction for the offense of murder omitted a requisite element. We are of the opinion that the jury's verdict in *Stuller* finding that the defendant was guilty of manslaughter can only be interpreted that the jury found beyond a reasonable doubt that the defendant had at the time of committing a homicide the requisite elements for manslaughter. Having made this finding, the verdict of the jury negated any possibility that the defendant possessed the specific intent necessary for a conviction of murder. The *Hoffer* court indicated that in *People v. Fox* (1983), 114 Ill. App. 3d 593, there is a "silence" as to whether the proper instruction for the offense of murder was given to the jury. The reasoning in *Hoffer* is strained when it becomes necessary to presume that an erroneous instruction might have been given. The *Hoffer* court failed to discuss *People v. Kendricks* (1984), 121 Ill. App. 3d 442, which is in direct conflict with its decision. We have examined all of the authority relied upon by the court in *Hoffer* and have concluded that the authority cited herein is more compelling and that the defendant's conviction for manslaughter impliedly results in an acquittal of the charge of murder.

The State further argues that despite the foregoing the verdicts returned in the instant case are not inconsistent since the defendant was charged with separate acts of choking the victim (murder and manslaughter counts) and failing to seek medical attention (manslaughter count alone). We find this argument unpersuasive and directly contrary to the precedents cited.

■ For the reasons set forth the judgment of guilty for the offense of murder entered against the defendant and the sentence imposed thereon must be reversed and this case remanded for resentencing for the offense of involuntary manslaughter.

We decline to remand defendant's aggravated battery conviction for resentencing, however, since these acts occurred as the result of the same transaction or occurrence as the involuntary manslaughter. *People v. Lilly* (1974), 56 Ill. 2d 493, 309 N.E.2d 1.

Finally, the defendant contends that the trial court erred in refus-

ing to give defendant's tendered instruction on negligence.

■■ We believe the jury was properly instructed based upon the evidence. The issues instruction adequately covered the defense theory in that an instruction which tells the jury that they must find the defendant not guilty if the requisite mental state is lacking is an inverted way of instructing the jury as to the elements of the crime and the State's burden of proof. *People v. Witherspoon* (1973), 55 Ill. 2d 18, 302 N.E.2d 3.

The evidence in this case indicated that when the defendant shook his son he was angry, that he was aware of his actions, and with conscious disregard (recklessness) for his son's safety continued to shake him. This was not a case where the defendant inadvertently dropped his son or negligently injured him. The defendant was aware of what he was doing, despite the fact that he may not have been aware of the consequences of his actions.

The basic difference between involuntary manslaughter and murder is the mental state which accompanies the homicide. (*People v. Gresham* (1979), 78 Ill. App. 3d 1003, 398 N.E.2d 398.) The jury's finding that defendant unintentionally killed his son did not establish, as defendant contends, that he *acted* unintentionally, only that the *result* of his intentional actions (his son's death) was unintentional.

For the foregoing reasons, the judgment of the circuit court of Peoria County is affirmed as it pertains to defendant's conviction for involuntary manslaughter and reversed as it pertains to defendant's conviction for murder. The case is remanded to the circuit court of Peoria County for resentencing for the offense of involuntary manslaughter.

Judgment affirmed in part, reversed in part.

STOUDER, J., concurs.

JUSTICE HEIPLE concurring in part, dissenting in part:
I concur with the majority opinion on all issues except for the fifth issue. I do not believe the jury's finding of involuntary manslaughter negates a finding of the required mental state for murder. Therefore, I dissent.

It must be noted at the outset that the cases cited in the majority opinion on this issue stand for two separate propositions, only one of which is directly relevant to the fifth issue. In *People v. Keith* (1978), 66 Ill. App. 3d 93, the jury was instructed on *both* the lesser offense of involuntary manslaughter and the greater offense of murder, but

returned a verdict of guilty *only* on the lesser offense. Under such circumstances, courts recognize the silence of the jury concerning the greater offense as an implicit acquittal of the greater offense. Consequently, double jeopardy bars a retrial on the greater offense. (See *Green v. United States* (1957), 355 U.S. 184, 2 L. Ed. 2d 199, 78 S. Ct. 221.) The above-cited cases do not apply to the instant case. Here, the jury was instructed on *both* the lesser offense of involuntary manslaughter and the greater offense of murder. However, the jury returned a finding of guilty on *both* the lesser and greater offense. There was no silence concerning the greater offense, and, thus, no implied acquittal of the greater offense.

The majority opinion also cites *People v. Fox* (1983), 114 Ill. App. 3d 593, and *People v. Stuller* (1979), 71 Ill. App. 3d 118. These cases do deal with the question of negation of mental state. However, in *Fox* and *Stuller* the defendant was convicted of both *voluntary* manslaughter and murder. The instant case is distinguishable because the defendant was convicted of both *involuntary* manslaughter and murder.

In *Stuller*, the jury was instructed on the elements of the crime of voluntary manslaughter, which is defined in subsection (b) of section 9—2 of the Criminal Code of 1961. (Ill. Rev. Stat. 1978, ch. 38, par. 9—2(b).) Subsection (b) manslaughter occurs where a defendant knowingly kills an individual and, at the time of the killing, the defendant believed the killing was justified, yet that belief was unreasonable. The jury was also instructed on murder. The appellate court found error because the murder instruction was incomplete. The instruction did not include the element "that the defendant did not believe that circumstances existed which justified the use of force." Obviously, there is a direct conflict between a finding that the defendant believed the killing was justified (voluntary manslaughter), and a finding that the defendant did not believe the use of force was justified (murder). Consequently, the omission in the murder instruction mandated a reversal of the murder conviction.

In *Fox*, the jury was instructed on the elements of the crime of voluntary manslaughter, which is defined in subsection (a) of section 9—2. Subsection (a) manslaughter occurs where a defendant kills while acting under a sudden and intense passion resulting from serious provocation. The jury was also instructed on murder. Citing *Stuller*, the *Fox* court held that the murder conviction must be reversed. The *Fox* court noted that "the offense of voluntary manslaughter is an acknowledgment by the law of the mitigating effect of human weakness and intense passion in an otherwise unjustified homicide."

(*People v. Fox* (1983), 114 Ill. App. 3d 593, 595.) In a sense, then, the law recognizes an exception to a murder conviction where passion and provocation, or an unreasonable belief that the killing was justified, can be proved. Consequently, where a jury finds a defendant committed voluntary manslaughter and murder, a court may rectify any legal inconsistency resulting from the multiple convictions by setting aside the murder conviction.

A finding of involuntary manslaughter, however, does not, likewise, preclude a murder conviction. In the instant case, the jury was instructed on murder as follows:

"A person commits the offense of murder when he kills an individual if, in performing the acts which cause the death he knows that such acts create a strong probability of death or great bodily harm to that individual or another."

The instructions on involuntary manslaughter provided that:

"A person commits the offense of involuntary manslaughter when he unintentionally causes the death of an individual by acts which are performed recklessly and are likely to cause death or great bodily harm to another."

Recklessness was defined as a *conscious disregard* for a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation.

A comparison of the elements of the murder and involuntary manslaughter instructions above reveals that the two crimes are very similar. Indeed, involuntary manslaughter is considered a lesser included offense of murder. (See *People v. Ortiz* (1978), 65 Ill. App. 3d 525, 531.) The essential difference between the crimes, as charged here, is that the lesser crime is based upon recklessness, while the greater offense requires knowledge of a strong probability. Yet, the difference between recklessness and knowledge of a strong probability has been recognized as having no sharp dividing line and is one of degree. (See *People v. Davis* (1966), 35 Ill. 2d 55, 60.) A person can knowingly create a strong probability of death or great bodily harm (murder), and at the same time consciously disregard a risk (reckless conduct) that his acts are likely to cause death or great bodily harm (involuntary manslaughter). Thus, the jury could have reviewed the facts of the instant case and consistently and reasonably found that the defendant's acts were sufficient to satisfy their instructions on murder and also sufficient to satisfy their instructions on involuntary manslaughter.

The defendant was protected from any legal prejudice resulting from multiple convictions by the supreme court's holding in *People v.*

*King* (1977), 66 Ill. 2d 551, 566. *King* held that a defendant cannot be subject to multiple convictions based on the same act, or based on separate acts where an offense is a lesser-included offense of the other. The *King* court did not state which conviction, the lesser or the greater, must be set aside. Courts have set aside the lesser offense. (See *People v. Harris* (1982), 104 Ill. App. 3d 833, 841; *People v. Dandridge* (1981), 98 Ill. App. 3d 1021, 1027.) The trial judge, in the instant case, was apparently aware of the *King* holding because he only entered the murder conviction against the defendant.

I believe the jury's findings were factually consistent and the trial court's decision not to enter the involuntary manslaughter verdict eliminated any legal inconsistencies. A finding of involuntary manslaughter does not preclude a conviction for murder. Therefore, I dissent from the majority's decision to reverse the murder conviction.