THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ALBERT WARE, Defendant-Appellant.

First District (5th Division)   No. 79-121

Opinion filed March 14, 1980.

Ralph Ruebner and Susan Solovy, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Joel A. Eisen-Stein, and Mark S. Komessar, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Defendant and Anthony Carr were indicted for the murders and armed robberies of Lloyd Smith and Gene Goodwin. (Ill. Rev. Stat. 1973, ch. 38, pars. 9—1 and 18—2.) Carr pleaded guilty to the charges before defendant's trial. Defendant was tried in a bench trial and was found guilty of two counts of murder but not guilty of armed robbery. He was sentenced to a term of 30 to 60 years. On appeal, he contends: (1) he was not proved guilty beyond a reasonable doubt; (2) certain fingerprint evidence was improperly admitted; and (3) certain evidence of Carr's guilt was erroneously admitted against defendant. Because we find that defendant's guilt was not proved beyond a reasonable doubt and reverse his convictions, it is unnecessary to address his other contentions. The following pertinent evidence was adduced at trial.

Chicago police officer Pevitts testified that on November 26, 1975, he responded to a radio call, proceeded to a certain address, and was met there by Dorothy Smith. He proceeded to the second floor of the building and found Lloyd Smith dead in one bedroom and Eugene Goodwin dead in another bedroom. Both bodies were already stiff. The two bedrooms were in a state of disarray and the phone lines had been cut.

Dorothy Smith, Lloyd Smith's sister-in-law, testified. She lived on the first floor below the apartment of the two victims. On November 26, 1975, she and her husband woke up at about 5:15 a.m. At about 5:30 a.m. she went to the back door to look for her dog. She did not find the dog nor did she see anyone outside. At about 6 a.m. she walked her husband to the front door as he left. She noticed that the door to the second-floor apartment was open so she closed it. The door locked automatically. From her apartment she could hear the television upstairs playing loudly. She telephoned upstairs but no one answered. At 7 a.m. she left for half an hour to get a paper. While she was out she saw Arnold Brown and inquired whether he had seen Lloyd Smith board a bus for work, but

Brown had not. She went home and called upstairs and again got no answer. She called Lloyd's employer and was informed that he was not at work. She and her granddaughter then broke the lock on the door to the second floor and went upstairs. After finding Smith she called the police.

When the police arrived, she went back upstairs with them. The police found Goodwin's body in another bedroom. The back door to the apartment was locked that morning. She saw a red jacket on the sofa in the front room and a hat, neither of which she had seen before. There were also a wine bottle on the kitchen sink and gin bottles on the side. When the police left they put a seal on the door, which remained until Mrs. Goodwin came to get some of her husband's belongings. Mrs. Goodwin moved the red jacket from the sofa to the kitchen. Police removed the jacket on January 28, 1976.

She testified that she last saw Lloyd Smith on November 25 at about 5:30 p.m. in her apartment carrying a half-pint bottle of liquor. She last saw Goodwin at about 10:30 a.m. standing at the top of the stairs. She also saw Arnold Brown at about 3:30 or 4 p.m., standing on her front porch. He had just left the upstairs apartment. She did not see or hear anyone enter or leave the building between 10:30 a.m. and 5 p.m., when Lloyd Smith came to her apartment. When he left he went upstairs and she did not hear or see anyone enter or leave the upstairs apartment that evening. She was in bed listening to the news at about 10 p.m. Her bedroom was directly below Lloyd Smith's. Sometime between 10:10 and 10:20 p.m. she heard a bumping noise upstairs, like someone was staggering or bumping against a wall. She heard nothing else and went to sleep before 10:30 p.m.

Claude Smith, Sr., Dorothy's husband and Lloyd's brother, testified. On November 26, 1975, he fell asleep about 6:30 p.m. but was awakened by the 10 p.m. news. At about 10:30 p.m. he heard a bumping sound upstairs and then a groan. About 10 or 15 minutes later he heard someone coming down the stairs. He heard no one else use the stairs to the second floor that night.

Claude Smith, Jr., testified that he arrived home at about 10 p.m. on November 25, 1975. He noticed that the front door to the second floor apartment was closed at that time. He went to his bedroom which was directly below Goodwin's room. After 10 or 15 minutes he heard bumping coming from the kitchen upstairs near his uncle's room. It sounded as if someone were dropping something. He left the apartment at about 10:20 to look for his dog. On his way out of the building he did not notice whether the door to the second floor was opened or closed. He spoke to a neighbor on the corner for about 15 minutes. He saw one other man but saw no one coming from his home. When he went back into his building he noticed that the door to the upstairs apartment was open, but he left it

open. As he passed his father's room he told him that the door was open. He did not hear anyone use the stairs to the second floor. He was shown a jacket, marked as the State's exhibit No. 17A, which he had never seen before.

Arnold Brown, a neighbor and friend of the two victims, testified. On November 25, 1975, he was at their apartment around 7 or 8 a.m. At about 9 or 10 a.m. he went to a liquor store to buy some gin and beer. He returned to the apartment and drank with Goodwin. While he was there Goodwin received a phone call and the apartment was in order. He left the apartment between 1 and 2 p.m.

At trial, he identified a pint bottle of gin which looked like the one he bought on the day in question. He was shown some half-pint bottles which he said were not at the apartment when he was there. He was also shown two glasses which he stated he did not use that day. He also did not see State's exhibit No. 17A in the apartment or did he see either victim ever wear it.

On cross-examination Brown admitted that he had been convicted of burglary, had been a narcotics addict for six years, and was a lover of both victims.

Andrew Henderson testified that in December 1975 he bought a black leather coat from Anthony Carr and that Ernie Kendrix bought a short brown leather jacket from Carr. He was later contacted by police and he turned the coat over to them. At trial, he identified State's exhibit No. 19 as the coat he had purchased. He stated that he had selected a photograph of Carr as the man who sold him the jacket and had shown it to the police.

Chicago police investigator Chatman testified that he dusted the victims' apartment for fingerprints. Included among the items taken from the apartment were a palm print found on a door frame, a clear glass found on the front room couch, a plastic glass found on a cocktail table, a pint gin bottle, a blue plate and several beer cans.

Chicago police officer Olejniczak, a fingerprint technician, testified. He compared a negative of a latent impression found on a glass with a copy of an inked impression of defendant's prints. In his opinion the latent print corresponded with the left forefinger of defendant's impression. A comparison of defendant's inked impression and the copy of the impression revealed that they were of the same person. On cross-examination he stated that there was no way to determine how long a fingerprint had been on a surface.

Chicago police officer Krupowicz, also of the fingerprint unit, testified that the latent palm impression found on the door frame was Anthony Carr's. The defense objected to this testimony on the ground that it was irrelevant to the issue of defendant's guilt. The objection was

overruled because the State had argued that defendant was guilty on an accountability theory.

Chicago police officer Wasmund testified that when he arrested Anthony Carr on January 29, 1976, defendant answered the door of the apartment where the arrest took place.

Chicago police officer Podgorny testified that on February 10, 1976, he went to defendant's place of employment and told him that he wanted to talk to him. In the squad car he told defendant that he was a suspect in a murder case for which Carr was already in custody, advised defendant of his rights and took him to a police station. After being shown pictures of the victims and the murder scene, defendant denied knowing them or ever having been at their apartment building. Defendant told Podgorny that he had been to the west side (the area where the killings took place) only twice previously, at times unrelated to the night in question. Defendant was shown a photograph of the red jacket found in the apartment and told Podgorny that Carr, who was defendant's roommate, had a similar jacket but so did eight or nine other people he knew. Defendant stated that he had not seen Carr's jacket for some time. Podgorny informed defendant that his fingerprints were found on a glass in the apartment and showed him a copy of the fingerprint report. Defendant said that he was never in the apartment and suggested that someone else must have put them there. Defendant told Podgorny that during the previous Thanksgiving week he had worked Monday through Friday from 10 a.m. until 6 p.m., Saturday from 6 p.m. until 3 a.m., and Sunday from 6 p.m. until 2 a.m. Podgorny believed that November 25, 1975, was a Wednesday. He also conducted a five-man lineup, including defendant, which was viewed by William Jett.

Chicago police officer Bertucci testified that he accompanied Podgorny on defendant's arrest. His testimony basically corroborated Podgorny's. In addition, defendant told him that Carr had lived with him since Carr got out of prison. Defendant told him that on the night of the killings, he worked and then went straight home.

Expert medical testimony established that Smith died from a laceration of the heart. An autopsy revealed that he probably ate less than 4 or 5 hours before he died and that his blood contained a small amount of alcohol. Goodwin also died from a laceration of the heart in association with external violence to the neck. His blood contained a moderately large amount of alcohol.

Gene Goodwin, Jr., testified that the State's exhibit No. 19, the black leather jacket, belonged to his father. He was also shown a picture of State's exhibit No. 17A, the red jacket, and stated that the jacket had been in his father's apartment when he went to remove his father's belongings. He testified that he had seen Carr wearing this jacket in the summer

and fall of 1975. The witness was then shown the red jacket itself, and identified it as the one he saw in his father's apartment. He stated that his father did not own a jacket like that and that Tony Carr used to wear it.

William Jett testified that he lived next door to the victims on the night of their deaths. He left his home between 8:30 and 9:30 p.m. that night and went behind his house. That area as well as the area next door was lit by two flood lights and an alley light. He saw a man at the back door which leads to the back stairway of the victims' residence. He was about 20 feet from the man. At first he could see only the back side of the man's shoulder but he turned and the witness could see his whole face and body. Jett then walked to the alley and the man in the next yard did the same. Jett got in his car while the man walked down the alley.

On February 10, 1976, he viewed a lineup of six or seven people. He recognized one man and stated that "It looked just like" the man he saw in the back yard. When asked if he saw that man in court, he responded, "Yes, I think it's the same one" and pointed to defendant.

On cross-examination Jett testified that he saw the man in the yard for two or three seconds and was not sure if defendant was the same man.

It was stipulated that if called, Evelyn Goodwin, Gene's wife, had a telephone conversation with her husband at about 7 p.m. on November 25, 1975.

Both sides rested.

The court found defendant guilty of both murders but not guilty of the armed robberies. The court found that the following evidence established defendant's guilt: (1) the drinking glass with defendant's print on it was not seen by Brown when he left at 3:30, establishing that defendant was present later; (2) defendant was seen in the rear of the building at about the time of the murders; (3) defendant's fingerprint indicated that his denial to the police that he knew the victims or had been to their apartment was a lie; and (4) the circumstances of the crimes indicated that more than one man committed them.

OPINION

■■ It is agreed by both sides that the evidence of defendant's guilt is entirely circumstantial. Where a murder conviction rests solely upon circumstantial evidence, the guilt of the defendant must be so thoroughly established as to exclude every other reasonable hypothesis. (*People v. Garrett* (1975), 62 Ill. 2d 151, 339 N.E.2d 753; *People v. Benedik* (1974), 56 Ill. 2d 306, 307 N.E.2d 382.) The trier of fact is not required to search out a series of potential explanations compatible with innocence and then raise them to the status of a reasonable doubt. (*People v. Benedik*; *People v. Pappas* (1978), 66 Ill. App. 3d 360, 383 N.E.2d 1190.) Nor must each link

in the circumstances relied upon to establish guilt individually constitute proof beyond a reasonable doubt. (*People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6; *People v. Pappas.*) However, to justify a conviction, circumstantial evidence must produce a reasonable and moral certainty that the accused committed the crime. (*People v. Magnafichi* (1956), 9 Ill. 2d 169, 137 N.E.2d 256; *People v. Pappas.*) Finally, a court of review will not set aside the judgment of the trial court unless the proof is so unsatisfactory as to cause a reasonable doubt of guilt to appear. *People v. Lofton* (1977), 69 Ill. 2d 67, 370 N.E.2d 517; *People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733.

■■ Looking at all the evidence presented at trial, we are unable to say that it produces a reasonable and moral certainty that defendant murdered or was responsible for the murders of the victims. While we recognize that it is the function of the trial court to determine the credibility of the witnesses, the weight to be given to their testimony and the inferences to be drawn from the evidence (*People v. Berland* (1978), 74 Ill. 2d 286, 385 N.E.2d 649; *People v. Foster*), we find that a reasonable doubt of defendant's guilt remains. This is not a case where the issue of defendant's guilt is resolved by a determination of which version of conflicting evidence is true. (See *People v. Foster*; *People v. Berland*; *People v. Akis.*) The only evidence at trial was presented by the State and was not contradicted by defendant. Assuming that the fingerprint evidence was properly admitted, that Mr. Jett's identification was positive, and that all other evidence was relevant to defendant's guilt and properly admitted at trial, the issue is whether the State's case so conclusively established defendant's guilt as to exclude every reasonable hypothesis of innocence. The State argues that it did while defendant contends that it did not. We agree with defendant.

From the evidence presented at trial and inferences which could be drawn therefrom, the trial court astutely reconstructed the following account of the events that transpired on the night in question. He concluded that the victims must have died between 9:30 and 10 p.m. Their deaths had to occur after 7 p.m., when Gene Goodwin spoke to his wife on the telephone. The expert medical testimony indicated that Smith had eaten less than four to five hours before his death. Since there was no food or garbage found in the apartment after the killings, Smith must have eaten before he arrived at his sister's apartment at 5 p.m. to pick up his mail. Since he was employed, he must have eaten between 4:30 and 5 p.m. Adding five hours to this time placed his death at approximately 9:30 to 10 p.m. From the nature of the deaths, both victims must have been killed at approximately the same time. In addition, the deaths could not have occurred much later than 11 p.m. since, when found at 8:30 a.m., the

bodies were already stiff, indicating an advanced stage of rigor mortis. The medical testimony showed that it took between 12 and 18 hours for this to occur.

The trial court further concluded that the ransacking of the apartment took place between 10 and 10:30 p.m. and that this is what was heard by the residents below between those times. In addition, the trial court found that the circumstances of the crimes indicated that they were committed by more than one person. In particular, the fact that there was no blood found on the floor or anyplace else indicated that there had been no struggle, which the court felt would have taken place if only one person was involved. Goodwin's strangulation, the fact that the wounds were nearly identical, the thorough ransacking of the apartment, and the cutting of the phone wires were also thought to indicate that the murders could not have been committed by one person.

Concerning the evidence of defendant's guilt the trial court concluded that defendant's fingerprint on the glass found on a sofa clearly showed that he was in the apartment on the day in question. Mr. Brown testified that no glasses were used when he was in the apartment and that he left between 1 and 2 p.m. However, Mrs. Smith stated that Brown left at 3:30 p.m. The court found that the glass was not there when Brown left at 3:30 p.m. In addition, defendant was seen by Mr. Jett behind the apartment building between 8:30 and 9:30 p.m.

The final piece of evidence considered by the trial court was defendant's statement when he was arrested that he did not know the victims nor had he ever been to their apartment. This was found to be an obvious lie which evidenced defendant's guilt. Defendant's reply when confronted with the information that his fingerprint was found in the apartment was also found to be a significant lie.

■■ We cannot agree that the evidence presented at trial established defendant's guilt beyond a reasonable doubt. The fingerprint evidence established only that defendant was in the apartment sometime after 3:30 p.m. and did not limit defendant's presence to the time of the murders. A defendant's fingerprint found at the crime scene may be sufficient proof of identity to sustain a conviction if the fingerprint could have been impressed only at the time the crime was committed. (*People v. Donahue* (1977), 50 Ill. App. 3d 392, 365 N.E.2d 710; *People v. Reno* (1975), 32 Ill. App. 3d 754, 336 N.E.2d 36.) The State relies on *People v. Reno* to uphold the conviction. That case involved burglary and murder in which the only evidence of defendant's guilt was his thumbprint found on a package of cigarettes taken from the victim's home. The package was found with several of the victim's purses in a garage which was three doors from the victim's home. Through the testimony of various witnesses, a chain of contact was established which showed that defendant's print could only

have been placed there during a 2½-hour period in which the murder occurred. The court found that from the unexplained presence of defendant's fingerprint during that period, a jury could find that the print could have been impressed only at the time of the crime and that defendant had committed the murder.

Defendant relies on *People v. Donahue* in which a murder conviction was reversed because the evidence did not exclude the possibility that the fingerprint could have been impressed at some time other than the time of the crime. There the victim was found with her head covered with plastic bags which were secured around her neck with two cords. One of the cords was the electric cord to a steam iron, on which defendant's fingerprint was found. There was also testimony presented which showed that defendant had visited with the victim at least a week prior to her death. Under those circumstances the court noted that the fingerprint evidence did not rule out the possibility that the print could have been impressed at a time unrelated to the crime and found that a reasonable doubt of defendant's guilt existed.

In the instant case the fingerprint establishes that defendant may have been in the apartment at the time of the murder but does not exclude the possibility that he was there earlier in the day and left before the crimes. Other evidence suggests that defendant may have gone before the crimes were committed. The exact time of death was not established and in view of the circumstantial nature of the evidence could not have been. The murders probably occurred sometime between 9:30 p.m., as the trial court found, and 10:30 p.m. when Mr. Smith heard the bumping noise and then a groan. From Mr. Jett's testimony it appears that defendant may have left the area before those times. Since the evidence does not exclude the possibility that the fingerprint may have been impressed at a time unrelated to the crime, it does not establish defendant's guilt beyond a reasonable doubt. As already discussed, Mr. Jett's identification, even if considered positive, does not conclusively establish that defendant was at the scene at the time of the crime or any link between defendant and the crimes. It did place him near the scene at a possible time of the crime but did not exclude the possibility that defendant left and Carr committed the murders alone.

The evidence does not clearly show that the crimes must have been committed by more than one man. Smith was found in his bed while Goodwin was found slouched in a chair. There was no sign of a struggle indicated by the condition of the apartment and this is consistent with the fact that the blood was confined to the immediate area of the deceased men. Goodwin's blood contained a large amount of alcohol while Smith's blood contained a small amount. There was evidence that Goodwin had been drinking earlier in the day and that Smith came home with a liquor

bottle. Both victims were stabbed in the heart. These facts could indicate that each man received quick, mortal wounds in the place where he was found. A lack of struggle would be consistent with the fact that they had been drinking and may have been asleep or that their ability to resist had been greatly impaired. In any event the evidence does not suggest that the murders could not have been committed by one man.

The fact that defendant denied any familiarity with the victims or the apartment building does not clearly evidence his knowledge of guilt. Defendant's roommate had been arrested for the crime in defendant's presence on January 29, 1976. Defendant was arrested on February 10, 1976, and was aware that his roommate was already in custody. He was also aware that he had been in the apartment on the day in question. Carr may have confessed the crimes to him earlier and defendant may have feared guilt by association. The natural tendency under these circumstances would be to deny all connection with the crime even after learning that a fingerprint had been found at the scene. The denial did not clearly evidence guilt.

Finally, there was no proof that defendant was accountable under section 5—2(c) of the Criminal Code of 1961. (Ill. Rev. Stat. 1973, ch. 38, par. 5—2(c).) In order to prove accountability under this section of the Criminal Code, the State must prove beyond a reasonable doubt that: (1) defendant solicited, aided, abetted, agreed or attempted to aid another person in the planning or commission of the offenses; (2) this participation must have taken place either before or during the commission of the offenses; and (3) it must have been with the concurrent, specific intent to promote or facilitate the commission of the offenses. *People v. Ramirez* (1968), 93 Ill. App. 2d 404, 236 N.E.2d 284; *People v. Tillman* (1971), 130 Ill. App. 2d 743, 265 N.E.2d 904.

It is not enough to show that defendant's acts facilitated the commission of the later offenses by another. Rather, the State must prove beyond a reasonable doubt that whatever conduct facilitated the later offense was done with the intent that such offense be committed. *People v. Brumbeloe* (1968), 97 Ill. App. 2d 370, 249 N.E.2d 150; *People v. Tillman.*

There was no evidence presented to establish defendant's accountability for the murders. The theory assumes that two men committed the crime, which the evidence does not necessarily indicate. There is no dispute that defendant's roommate committed the murders. However, no agreement between the two was established, nor was it proved that defendant aided Carr at the time of the murders. The circumstantial evidence established that Carr and defendant were roommates, were both present in the apartment on the day in question, and that defendant was outside the building at a possible time for the murders.

From these facts it could be inferred that he acted with Carr to kill the victims, or was aware of the activity going on inside and was acting as a look-out. However, the assumption that two or more men necessarily committed the crimes is debatable as discussed earlier. Carr could have acted alone, and defendant may have been unaware of the killings. It was never established that defendant was present at the time of the murders. Clearly this evidence did not establish the elements of accountability beyond a reasonable doubt.

We find that the foregoing evidence "creates a strong suspicion that defendant may have been connected with the offenses, but this does not establish his guilt beyond a reasonable doubt." (*People v. Ivy* (1979), 68 Ill. App. 3d 402, 406, 386 N.E.2d 323.) Accordingly, the judgment of the circuit court is reversed.

Reversed.

SULLIVAN, P. J., and WILSON, J., concur.