THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HAL J. ELLISON, Defendant-Appellant.

First District (2nd Division)    No. 79-1308

Opinion filed September 15, 1981.

James J. Doherty, Public Defender, of Chicago (Robert D. Glick and Suzanne Xinos, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr and Mary Ellen Dienes, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

Defendant was indicted for involuntary manslaughter (Ill. Rev. Stat. 1973, ch. 38, par. 9—3(a)) and concealment of the homicidal death (Ill. Rev. Stat. 1973, ch. 38, par. 9—3.1(a)) of Tammy White, an alleged transsexual (victim). Defendant was charged with having recklessly injected silicone into the victim, which resulted in her death minutes later, and having thereafter concealed this cause of death from the authorities. Defendant was convicted on both counts in a jury trial and received concurrent sentences of 1 to 3 years. The principal factual issue at trial was whether the silicone injection, rather than one of several other possible causes suggested by defendant, resulted in the victim's death. On appeal, defendant challenges the jury's determination on this issue, claiming that it was just as likely that the victim died from a Darvon overdose, anaphylactic shock or "silicone transferring." For the reasons set forth below, we affirm.

The State presented the following case at trial. Jerry Lawrence, a Chicago Police Department homicide investigator, testified that at 7 p.m. on December 5, 1974, he was assigned to investigate the death of a person in an apartment on North Marine Drive in Chicago. He entered that apartment and saw the victim in a reclining chair. Defendant and one April Vaugine (April) were standing nearby. Defendant explained that he, April, and the victim had gone to supper earlier and returned to defendant's apartment. The victim went into the bathroom where she remained for about 30 minutes. She returned to the den and sat in the reclining chair. Shortly thereafter, the victim said "I think I am on a trip," then went into convulsions. The convulsions stopped and defendant summoned an ambulance. No mention was made of the injection. Upon searching the apartment, Lawrence discovered a large quantity of different medications which defendant explained were prescribed for him for various ailments. Defendant stated that he owned and operated Silico Chemical Co., a wholesaler of industrial chemicals, which bought silicone in bulk and packaged it for sale to industrial clients. Lawrence removed the victim's clothing so that the evidence technician could photograph the corpse. He inspected her body for wounds, bruises, cuts or any other evidence of violence but found none. On cross-examination, Lawrence testified that the victim's purse contained 18 orange pills and 19 red pills,

all of which he believed were Darvon. The pills were inventoried but he did not know if they were ever subjected to chemical analysis.

Michael Page testified that on December 5, 1974, he was employed by Dependable Ambulance Service and drove an ambulance to an address on North Marine Drive. When he arrived, he saw the victim sitting in a chair. He examined her and determined that she had been dead "for a little while." The only persons in the apartment when he arrived were defendant, the victim, and two women. He called the police and they arrived shortly thereafter. Prior to the police photographs of the corpse, he noticed a small puncture mark under the victim's left breast.

April Vaugine testified that she was born in Los Angeles, California in 1944 as Paul Edward Vaugine. In 1969, she received a sex change operation in Morocco, after which she changed her name to April. She was introduced to defendant in 1967 for the purpose of arranging silicone injections. Defendant injected silicone into her bust, hips and face for $50 to $75 per injection. She ultimately received between fifty and sixty such silicone injections between 1967 and 1969. She was present on numerous occasions when defendant administered silicone injections to a number of people at the same visit and his procedure was always the same. The person who was to receive the silicone injection would indicate the part of the body where the silicone injection was desired. The person would then disrobe, defendant would clean the skin with alcohol, mark off the area with an eyebrow pencil, and inject an anesthetic with a hypodermic needle. He never would take a medical history, nor ask if any drugs were used nor ask about one's background. He did not use a stethoscope. After the anesthetic injection, he filled the same syringe with liquid silicone. He always used the same syringe, without cleaning it, for both the anesthetic and the silicone. He then would administer the silicone injection into the area where the anesthetic had been injected. Defendant would then use the same syringe on succeeding patients.

On December 5, 1974, at about 5:30 p.m., April and the victim went to see defendant for the purpose of receiving silicone injections. The three of them first went out to supper, then returned to defendant's apartment. The victim undressed and defendant looked at her breasts and commented that whoever had administered the prior silicone injections had done a poor job. Defendant did not ask the victim anything about her health or prior medical history. Defendant then cleaned the victim's breasts with alcohol and made five pencil marks under each, then cleaned and marked the victim's hips. As usual, defendant only had one syringe. Defendant filled the syringe with anesthetic from a small vial. The liquid anesthetic in the vial was crystal clear, like water, but the same liquid after being drawn into the syringe was "cloudy" and looked "like dishwater."

Defendant then injected this cloudy substance into five different places under each of the victim's breasts and then into her hips.

The victim immediately complained that she felt nauseous and went into the bathroom. Shortly afterwards, the victim returned still complaining of nausea and laid down on the couch. Within a minute, the victim began perspiring, her arms and upper body began shaking and she had difficulty breathing. She mumbled "I am on a trip," then completely stopped moving. Defendant said something was wrong and began massaging her chest. He phoned an ambulance, then told April that they had to dress the victim before the ambulance arrived. He removed the pencil marks from the victim's breasts, then he and April dressed her. He instructed April that if questioned, she should say only that they came up to the apartment for some drinks. When the police arrived, that is the story she related. She went home and the next day defendant called and said that "everything was okay" because the coroner had ruled that the cause of death was Darvon poisoning. Defendant called her again in February of 1976 and asked her to "stick to" the original story. In May of 1976, the state's attorney's office contacted her and she ultimately promised to give a statement if granted prosecutorial immunity, which she was given.

Patricia Gill testified that she was employed as an administrative assistant by Dalcorn, Inc., a silicone manufacturer. Dalcorn had sold various quantities of silicone to defendant from 1970 to 1973. Defendant, like all its silicone purchasers, was required to submit an affidavit that the silicone would not be used for injections into humans.

Norton Ross testified that he had been defendant's partner in the ownership of Silico Chemical Co. since 1957. Because the future success of the business became questionable, he withdrew as a partner in 1972. Rudy Cistaro, a registered embalmer and funeral director, testified that he embalmed the body of the victim on December 10, 1974. During the embalming procedure, he noticed puncture marks under both of the victim's breasts.

A stipulation was agreed upon indicating that subsequent to burial, the state's attorney's office began an investigation into the circumstances surrounding the death and, on February 5, 1976, an order was obtained requiring the remains to be disinterred. On February 10, 1976, the remains were delivered to the Cook County morgue.

Dr. Joseph Claparols, a pathologist with the Cook County Coroner's office, testified that on December 5, 1974, he performed the original autopsy on the victim. He took tissue samples from various organs in the event that a microscopic tissue examination became necessary after the initial autopsy. His autopsy concluded that the cause of death was a

Darvon overdose. He noticed abnormalities in the victim's lungs; however, he "* * * took a chance and signed the protocol without taking into account the lung pathology * * *."

Dr. Everette T. Solomons, chief toxicologist with the Georgia State Crime Laboratory in Atlanta, testified that in March of 1976, the tissue samples taken by Dr. Claparols were subjected to an atomic absorption spectrophotometry and an infrared spectrum test to determine the level of silicone in the various tissues. There was an extremely large concentration of silicone oil in the breast tissue. This would indicate that the breast area was the injection site for the silicone. Silicone particles were also found in the spleen, kidney, liver and lungs with the largest concentration, other than in the breast tissue, in the lungs.

Dr. Victor Levine, a physician specializing in pathology and formerly the chief pathologist for the Cook County Coroner's office, testified that on February 10, 1976, he performed a second autopsy after the remains of the victim were disinterred. He obtained tissue samples from various organs. He also secured those previously taken by Dr. Claparols. After identifying photographs which he had taken of the Claparols' tissues, Levine testified that the microscopic photographs of the lung tissue showed a number of abnormalities called vacuoles. A vacuole is an entirely abnormal, rounded empty space in the lung tissue. The numerous vacuoles found were caused by silicone particles. When foreign matter, such as silicone, enters the body, the body produces defensive cells to combat the matter. Small defensive cells begin to form from 15 seconds to several hours after the matter enters the body; however, giant cells do not begin to develop until foreign matter has been in the body for at least three weeks. The tissue samples of the victim's lungs indicated that some of the vacuoles were being "attacked" by giant cells and some by normal cells. In some instances no cells had yet formed. Since only a small number of the vacuoles were attacked by giant cells, he concluded that most of the other vacuoles had entered the lungs just 15 seconds to several hours before death.

Dr. Levine had reviewed Dr. Solomons' toxicology report concerning the amount of silicone in the lung tissue. Based on this report, Levine's examination of the remains, and the analysis of the Claparols' tissue samples, it was Levine's opinion that the victim "died as a result of pulmonary insufficiency, and the pulmonary insufficiency was caused by the presence of silicone vacuoles which blocked the capillaries of the lungs so completely that * * * [she] was no longer able to breathe properly and that caused * * * [her] death." The symptoms exhibited by the victim, including shaking, nausea, dizziness, and inability to breathe, which occurred after the injection and prior to death, would be consistent with the finding that pulmonary insufficiency due to silicone vacuoles caused

the death. If there was silicone oil suspended in the anesthetic in the syringe, it would be consistent with the above opinion. Sometimes a person experiences an allergic reaction to a local anesthetic which might vary from hives to respiratory difficulty to an "extreme reaction" known as anaphylactic shock. If the victim had suffered from anaphylactic shock, she could not have been revived by medical treatment due to the lung conditions previously described.

On cross-examination, Dr. Levine testified that he was familiar with an article published by the American Academy of Forensic Sciences authored by Drs. Solomons and Jones concerning a Georgia case study involving death from silicone injections. Dr. Levine did not base any part of his diagnosis or opinion on this Georgia case, although he compared the two. In an attempt to establish his "silicone transfer" theory, defense counsel elicited from Dr. Levine testimony that it is possible for something to be "carried from elsewhere [in the body] into the lung and it can be any number of things and * * * different sizes of things and there are blood clots that are so big that a single blood clot itself gets caught in the * * * pulmonary artery * * * and this is death from a pulmonary embolism." Death from such a cause can occur sometimes in three to four or eight to 10 minutes. Pulmonary embolism can be caused by silicone or other matter traveling from one part of the body to another. The symptoms exhibited by the victim prior to death are similar to the symptoms exhibited by a person experiencing anaphylactic shock or by a person who had taken "massive doses" of Darvon.

Dr. Michael Schaffer, chief toxicologist for the Cook County Medical Examiner's office, testified concerning the Toxicology Report compiled in December of 1974. The report indicates the presence of 2.0 milligrams of Darvon in the victim's gastric contents, the equivalent of about 1/32 of a single capsule of Darvon. The bile contained 6.4 milligrams percent of Darvon, a "significant" level. The report made no distinction, however, between pure Darvon and its metabolite. A metabolite is the substance remaining from Darvon which has already interacted with bodily substances, i.e., the combination of dissolved Darvon and body fluids. It is essential to distinguish between pure Darvon and its metabolite because the latter is nontoxic. Because the report failed to distinguish between the two, and because of the methodology employed, it could not be stated with certainty that the Darvon found in the victim's bile was a lethal quantity, even if the 6.4 milligrams represented pure Darvon.

Dr. Robert J. Stein, chief medical examiner of Cook County, testified that he received the original autopsy protocol and the Claparols' samples. It was his opinion that silicone pulmonary emboli caused the victim's death. He disagreed with Dr. Claparols' initial determination that the cause of death was Darvon poisoning. After discussing the silicone

content of the lung cells and vacuoles, he concluded that the introduction of organosilicone played a major role in the victim's death, an acute reaction, "[s]uddenly, within * * * minutes or so" of death. On cross-examination, Dr. Stein testified that it is possible for silicone to be injected into the body and repose in various portions thereof for days, weeks, or months, then later travel to another part of the body. Sometimes a giant cell which has begun to attack a silicone vacuole where it has reposed will rupture and expel the silicone, thus allowing it to travel to a different part of the body. As he "wasn't there," he conceded that he could not say precisely when the silicone entered the body. Dr. Stein also indicated that a local anesthetic rarely causes anaphylactic shock and that in this case, based on the absence of eosinophils, granular white blood cells, in all probability, the victim did not die from anaphylactic shock. The State then rested.

The defense called the following witnesses. Robert Mattia and Gary Anderson both testified that the victim had been a heavy Darvon user but neither had witnessed her consume any Darvon on December 5, 1974, the day of her death. Dr. Kenneth Costich, a pathologist with Northwest Hospital, testified that it was his opinion that the victim died of anaphylactic shock from a local anesthetic. On cross-examination, he testified that he had never studied the pathology of individuals who died from anaphylactic shock or from a silicone injection. He had never performed an autopsy on an individual who had died from a drug overdose or anaphylactic shock and had never read or conducted studies relating to death caused by Darvon.

Dr. George Christopoulos, a physician specializing in internal medicine at Hines V.A. Hospital and formerly a chief toxicologist with the Cook County Coroner's office prior to 1975, testified concerning the 1974 Toxicology Report. In his opinion, there is no significance between Darvon and its metabolite and that the 6.4 milligrams percent of Darvon found in the victim's bile could be fatal. The symptoms of Darvon poisoning are those exhibited by the victim. On cross-examination, he conceded that if an individual experienced an acute emboli in the lung capillaries due to a recent injection of silicone, the immediate cause of death would be pulmonary embulose rather than Darvon poisoning. The defense then rested.

In rebuttal, the State called Dr. Brian Finkle, director of the Center for Human Toxicology at the University of Utah. He testified that the institute conducted a major study, funded by the F.D.A. and involving over a thousand cases, which concluded that the metabolite of Darvon plays only a minor role in Darvon's toxicity. He had reviewed the 1974 Toxicology Report and considered the Darvon in the gastric content to be very low and nonlethal. The 6.4 milligram percent in the bile means very

little for analytical purposes because it does not distinguish between pure Darvon and its metabolite. Assuming the 6.4 milligram percent was a gross figure of Darvon plus its almost harmless metabolite, this amount would not be fatal. The symptoms exhibited by the victim just prior to death would not be those associated with Darvon poisoning. On cross-examination, Dr. Finkle testified that while the methodology requiring a distinction to be made between Darvon and its metabolite was employed prior to 1976, it did not become more widely used until after 1976. The State rested.

Upon the foregoing evidence, the jury returned a verdict of guilty on both charges, from which defendant appeals.

## I

Defendant asserts that the State failed to prove him guilty beyond a reasonable doubt, relying on the hypothesis of innocence doctrine, which provides that where the evidence of defendant's guilt is entirely circumstantial, the evidence must adequately show that there is no reasonable hypothesis of defendant's innocence. (*People v. Hansen* (1955), 5 Ill. 2d 535, 538-40, 126 N.E.2d 243; *People v. Wilson* (1948), 400 Ill. 461, 480, 81 N.E.2d 211.) The circumstantial evidence must produce a reasonable and moral certainty that defendant committed the crime. (*People v. Berland* (1978), 74 Ill. 2d 286, 308, 385 N.E.2d 649.) The trier of fact need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances relied upon to establish guilt, but it is sufficient if all the evidence taken together satisfies the trier of fact beyond a reasonable doubt of defendant's guilt (*People v. Williams* (1977), 66 Ill. 2d 478, 485, 363 N.E.2d 801). The State is not required to establish guilt beyond any possibility of a doubt. (*People v. Branion* (1970), 47 Ill. 2d 70, 77, 265 N.E.2d 1, *cert. denied* (1971), 403 U.S. 907, 29 L. Ed. 2d 683, 91 S. Ct. 2213.) Whether or not a reasonable hypothesis of innocence has been shown is to be determined by the jury sitting as the trier of fact (*People v. Foster* (1979), 76 Ill. 2d 365, 373-74, 392 N.E.2d 6), and this determination will not be disturbed on review unless the proof is so unsatisfactory as to cause a reasonable doubt of guilt to appear. (*People v. Warmack* (1980), 83 Ill. 2d 112, 128, 413 N.E.2d 1254.) The jury is not required to raise every potential explanation compatible with innocence to the status of reasonable doubt but instead is entrusted with determining whether a reasonable hypothesis of innocence exists. *People v. Ware* (1980); 82 Ill. App. 3d 297, 302-03, 402 N.E.2d 762; *People v. Branion*.

■■ The jury sitting in the case *sub judice* was presented with ample evidence demonstrating that defendant recklessly injected the victim with silicone which was connected with her death. First, April Vaugine's testimony sufficiently established that defendant injected the victim with

silicone minutes before her death. She observed that defendant customarily employed the same syringe for both the anesthetic and silicone injection on succeeding patients. The fluid in the syringe prior to the fatal injection contained a cloudy substance although the fluid in the anesthetic vial had been crystal clear. The inference therefore available is that when the anesthetic was drawn into the syringe, the syringe contained silicone oil remaining from a prior injection, and that it was this cloudy mixture of silicone and anesthetic which was injected into the victim. The inference is further supported by the immediate death of the victim attributed by expert testimony to silicone pulmonary emboli.

The jury was presented with expert testimony supporting the conclusion that the silicone injected in fact caused the death. The testimony of Drs. Levine and Stein established that the victim's lungs contained both silicone vacuoles which had been in the lungs for at least three weeks, based upon the existence of giant cells around some vacuoles, and a large amount of silicone vacuoles which had arrived in the lungs from within 15 seconds to several hours before death, based upon the absence of any defensive cells whatsoever around those vacuoles. According to these experts, the symptoms exhibited by the victim after the injection were those that would be expected from silicone pulmonary emboli. Based on their separate analyses, Drs. Levine and Stein concluded that death was caused by suffocation from the silicone vacuoles in the lungs resulting from defendant's injection. Accordingly, the jury's verdict was well founded upon the evidence.

Defendant argues that "silicone transfer," anaphylactic shock, or a Darvon overdose could each individually explain the victim's death, and that any one of them constituted a reasonable hypothesis of innocence which precluded his conviction. Defendant's tendered explanation as to the "silicone transfer" theory concedes that silicone in the lungs caused the victim's death; however, defendant asserts that it was not silicone from his injection which traveled to the victim's lungs, but instead was silicone previously injected into her body by someone else, which had reposed in one part of the body and then, coincidentally, moved to the lungs at the same time as defendant injected the victim. Defendant's support for this theory is the cross-examination testimony of Dr. Stein that it is possible for silicone to enter the body, then repose in one part and later travel to a different part of the body; yet, none of the witnesses testified that the numerous vacuoles in the victim's lungs which caused death had arrived there in this manner. The testimony indicated that for a silicone vacuole to travel from one part of the body to another, it must first "escape" from a defensive cell which had engulfed it. According to the State's evidence, each cell acts independently upon each individual silicone vacuole. Because the cause of death was numerous vacuoles in the lungs, numerous

reposed vacuoles would have had to escape from the defensive cells at about the same time and then all travel to or already be strategically present in the same location, the victim's lungs. The improbability of this occurring was asserted by the expert witnesses. It was well within the jury's province to reject this theory as a reasonable hypothesis of innocence.

The next defense explanation, that the victim died from the anesthetic which was injected, not from silicone, is based substantially upon the cross-examination testimony of Drs. Levine and Stein. Dr. Levine testified that he believed the victim died from pulmonary emboli and that the victim's symptoms after injection were consistent with this diagnosis. Although he conceded that anaphylactic shock "might" cause those symptoms, he asserted that anaphylactic shock would be an "extreme reaction" to a local anesthetic and that the victim would have died anyway from the silicone vacuoles in the lungs. Dr. Stein testified that a local anesthetic rarely would cause anaphylactic shock. He concluded that in this case, in all probability, it had not occurred because of the absence of eosinophils. In their opinions there was no evidence that anaphylactic shock caused the death, only that the symptoms "might" have been those of shock. The jury could have properly accepted the conclusion of Dr. Stein that anaphylactic shock had not occurred in rejecting this theory as a reasonable hypothesis of innocence.

Defendant's last tendered explanation is that the victim died from a Darvon overdose, and not from the injection. According to defendant, the victim had previously taken Darvon at some point in time and it was only coincidental that she died right after the injection. This theory is bottomed upon evidence given by both Mattia and Anderson that the victim had been a heavy Darvon user for years. Parenthetically, neither witnessed such use on the day of her death. Dr. Christopoulos testified that in his opinion, the 6.4 percent milligrams in the victim's bile "could be fatal" and that the physical symptoms exhibited by the victim prior to death are those that would be expected from Darvon poisoning. Lastly, Claparols' original autopsy on December 5, 1974, found that the cause of death was from Darvon. It was the jury's function to determine the witnesses' credibility, weigh the evidence and resolve conflicts therein. The jury could have considered Dr. Claparols' finding diminished by his admission that he "took a chance and signed the protocol without taking into account the lung pathology." It could also have deemed Dr. Christopoulos' opinion as contradicted by other expert witnesses. Both Drs. Schaffer and Finkle testified that it is critical to determine what portion in the body is pure Darvon and what portion is a Darvon metabolite. The latter is not lethal and therefore not relevant in determining whether the cause of death was from Darvon. Because the test results from the victim did not distinguish

between Darvon and its metabolite, it was not subject to precise analysis. The 6.4 percent gross figure of Darvon found in the bile would not be fatal. Finally, the symptoms were not those of Darvon poisoning. Dr. Schaffer, chief toxicologist of the medical examiner's office, could not say that even if the 6.4 milligrams were pure Darvon present in the bile, such a level would be lethal, and Dr. Finkle, director of a toxicology center, who had conducted a major test on this very issue, concluded that Darvon was not the cause of death. Dr. Christopoulos was a practicing physician who did not distinguish between Darvon and its metabolite. He had not been associated with the Coroner's office since 1975 and the new methodology of distinguishing between Darvon and its metabolite had not been widely employed until 1976. Thus, the value of his testimony could have been assessed by the jury as outweighed by those with greater expertise in the field. We find no basis for reversal of the jury's convictions in this regard.

## II

■■ The defense next argues that the State failed to prove the occurrence of a homicide and therefore failed to prove homicide concealment. (Ill. Rev. Stat. 1973, ch. 38, par. 9—3.1(a); *People v. Stiles* (1977), 46 Ill. App. 3d 359, 363, 360 N.E.2d 1217.) The evidence as detailed above, supports the State's claim that it did not prove the homicide. The State's assertion that it proved the concealment through defendant's acts of dressing the victim after the injection and death, instructing April to omit mention of the fact that an injection had been given, and otherwise concealing the nature of the death from the authorities, also finds support in the record.

## III

■■ Defendant's final argument concerns Illinois Pattern Jury Instruction, Criminal No. 3.02 (1968). This instruction provides that:

"Circumstantial evidence is the proof of facts or circumstances which give rise to a reasonable inference of other facts which tend to show the guilt or innocence of [the] [a] defendant. Circumstantial evidence should be considered by you together with all the other evidence in the case in arriving at your verdict.

You should not find the defendant guilty unless the facts and circumstances proved exclude every reasonable theory of innocence."

The State tendered only the first paragraph of this instruction and defendant's objection that the second paragraph should also be given was overruled. Defendant argues that because this case involved only circumstantial evidence on the principal issues, the omission of this second paragraph was reversible error under *People v. French* (1978), 59 Ill. App. 3d 353, 375 N.E.2d 502. In that case it was held that when all the evidence

is circumstantial, it is permissible, not mandatory, for the trial court to give this second paragraph of the instruction (59 Ill. App. 3d 353, 361). The court held that the omission was error only where justice has been denied or where it appears that the verdict resulted from such error. We find that neither condition exists in the record before us. See also *People v. Cox* (1979), 71 Ill. App. 3d 850, 861, 389 N.E.2d 1238; *People v. Boose* (1978), 65 Ill. App. 3d 127, 132, 382 N.E.2d 532; *People v. Hammers* (1976), 35 Ill. App. 3d 498, 507-08, 341 N.E.2d 471, *cert. denied* (1976), 429 U.S. 1002, 50 L. Ed. 2d 614, 97 S. Ct. 534.

For the foregoing reasons, we cannot disturb the jury's finding of defendant's guilt of involuntary manslaughter and concealment of a homicide. We therefore affirm.

Affirmed.

STAMOS and DOWNING, JJ., concur.